Jon Bryan MONSON, Plaintiff
and Appellant,

v.

Scott CARVER, Warden, and Utah
Board of Pardons and Parole,
Defendants and Appellees.

No. 950199.

Supreme Court of Utah.

Dec. 6, 1996.

J. Thomas Bowen, Salt Lake City, for plaintiff and appellant.

Jan Graham, Atty. Gen., Norman E. Plate, Asst. Atty. Gen., Salt Lake City, for defendants and appellees.

ZIMMERMAN, Chief Justice:

Jon Bryan Monson appeals from the district court's denial of his petition for a writ of habeas corpus in which he alleged that the Board of Pardons and Parole ("Board") committed various constitutional violations in setting his parole date and ordering him to pay restitution as a condition of parole. We affirm in part and reverse in part.

The facts leading up to this appeal are as follows: On November 18, 1985, Monson pleaded guilty to the murder of a coworker, Phillip W. Kerby. Monson and Kerby had been involved in various thefts from their employer, and Monson shot Kerby in the back and chest to prevent him from disclosing information concerning the thefts. Monson then buried Kerby's body under a pile of rocks near Oakley, Utah. Kerby's parents reported him missing to police on October 3, 1984. His body was not found until May 5, 1985, when Monson's brother discovered it under the pile of rocks. Thereafter, Monson readily admitted his guilt and cooperated with law enforcement officers.

Monson was initially charged with first degree murder, but the charge was reduced to second degree murder pursuant to a plea agreement. On November 18, 1985, upon the entry of Monson's guilty plea, the trial court sentenced him to an indeterminate term of five years to life for the second degree murder conviction and enhanced Monson's sentence by one year because he used a firearm in the commission of the murder, pursuant to section 76–3–203(1) of the Utah Code. The trial court also recommended that Monson receive psychological and substance abuse counseling and treatment while at the Utah State Prison. Shortly after entering prison, Monson was transferred to Utah State Hospital, where he remained until the end of 1992 as a participant in the public offenders program.

On November 19, 1986, the Board held Monson's initial parole grant hearing. The Board made no parole decision at the initial hearing but ordered a rehearing to be held in November of 1993, which the Board later rescheduled for November of 1992. At the November 1992 rehearing, Kerby's father was permitted to testify, and he questioned whether justice was served by allowing Monson to serve time at the state hospital rather than in prison. This sentiment was echoed

by the Board member who conducted the rehearing, although he also indicated that Monson had made "commendable progress" at the hospital, had obtained his high school diploma and associate degree, was working toward a journeyman plumber's license, and that hospital personnel felt that he had "reached a maximum" and was "well rehabilitated." Shortly after the rehearing, the Board issued a formal order granting Monson a parole date of November 23, 1999, and imposing four special parole conditions which required that Monson (i) submit to random drug testing, (ii) have no contact with Kerby's family, (iii) not consume or possess any alcohol, and (iv) pay restitution in an amount to be determined.

On January 19, 1993, Monson filed a pro se petition in the district court alleging that the Board had subjected him to cruel and unusual punishment and double jeopardy by refusing to consider and count the nearly seven years that he had spent at Utah State Hospital as time served toward his sentence. Monson later obtained the services of an attorney who, with leave of court and pursuant to a stipulation of the parties, filed an amended petition on November 3, 1993. The amended petition alleged that the Board (i) had exceeded its constitutional authority in ordering restitution; (ii) lacked statutory authority to order restitution at the time Monson's sentence was imposed, and thus its order violated the ex post facto prohibitions of the Utah and federal constitutions; (iii) failed to comply with certain procedural requirements when it ordered restitution; (iv) abused its discretion because its order of restitution was for something other than pecuniary damages; (v) subjected Monson to double jeopardy by ordering restitution; (vi) was imprisoning Monson effectively for failure to pay a debt in violation of article I, section 16 of the Utah Constitution; (vii) inflicted cruel and unusual punishment and violated due process by exceeding the Utah Sentence and Release Guidelines ("Guidelines") in setting a parole date for Monson; and (viii) did not provide Monson with adequate due process because it failed to give a detailed written rationale for departing from the Guidelines, failed to allow Monson to have an attorney at the 1992 rehearing and present witnesses on his behalf, failed to credit Monson with precommitment time served in jail and time spent at Utah State Hospital, and failed to provide an adequate rationale for his parole date. The Board answered and moved to dismiss the petition for failure to state a claim upon which relief may be granted or, alternatively, for judgment on the pleadings, pursuant to rules 12(b)(6) and 12(c), respectively, of the Utah Rules of Civil Procedure.

The district court held a hearing on the Board's motions on February 15, 1994. In its subsequent order, the court ruled that there was no right to parole under Utah law and that the trial court had imposed a valid indeterminate sentence upon Monson. Accordingly, the court reasoned, unless the Board in its unfettered discretion granted Monson a parole date, his term would not expire until his death. Because Monson was free to accept or reject any parole offer and its attendant terms and conditions, "the Board cannot make [Monson's] sentence any more harsh than that already imposed by the court at sentencing," so that the conditions of parole actually imposed were not "punishment" forbidden by the ex post facto or double jeopardy clauses of the Utah and federal constitutions. Specifically, the court ruled that the Board is free to set any parole conditions that are legitimately related to an inmate's underlying crime, including the restitution ordered in Monson's case. The court then ruled that a grant of parole after serving fourteen [1] years of a life sentence was not so harsh as to violate the cruel and unusual punishment clauses of the Utah and United States Constitutions. Accordingly, the court dismissed all of Monson's claims except those related to the Board's departure from the Guidelines. As to those claims, the court deferred making a decision until after an evidentiary hearing at which Monson would be required to prove that he actually relied on the Guidelines when he entered his guilty plea.

1. The district court's order mistakenly referred to a sixteen-year term of incarceration. In fact, the Board's order requires Monson to serve only fourteen years.

The evidentiary hearing was subsequently held on December 22, 1994. Monson and his mother both testified that Monson's trial attorney had indicated that Monson would actually serve about six to seven years based on the Guidelines if he pleaded guilty to second degree murder. Monson's trial attorney testified that while he conveyed his opinion that Monson would serve only seven to eight years, he had no personal knowledge of the Guidelines at that time and had simply given an estimate based on his general knowledge. The court then ruled that Monson had failed to demonstrate that he actually relied on the Guidelines when he entered his plea. Accordingly, the district court dismissed the remainder of Monson's claims.

Monson now appeals the district court's rejection of the claims he raised in his petition. Specifically, he contends that (i) Utah's indeterminate sentencing scheme constitutes cruel and unusual punishment; (ii) the Board lacks constitutional authority to order restitution; (iii) the Board's order of restitution violates constitutional and statutory prohibitions against ex post facto laws and subjected Monson to double jeopardy; (iv) the Board failed to follow proper procedures in ordering restitution; and (v) the Board violated Monson's due process rights at the 1992 rehearing by denying him legal counsel, not allowing witnesses to testify on his behalf, and failing to give an adequate rationale for its parole decision.

▆▆▆ Monson also raises several additional claims which were not included in his original or amended petition and which we do not address today. These additional claims are that the Board (i) failed to provide Monson with access to his Board file;[2] (ii) violated the compulsory process clause of the Sixth Amendment to the United States Constitution by failing to allow Monson to have witnesses testify on his behalf; (iii) violated the speedy trial clause[3] and rule 22 of the Utah Rules of Criminal Procedure by delaying Monson's "sentencing" for some seven years after the entry of his guilty plea; (iv) is bound by the alleged representations of individuals within the criminal justice system that if Monson participated in the public offenders program, he would be paroled shortly after successfully completing the program; and (v) offends the separation of powers principles contained in article V, section 1 of the Utah Constitution because it makes sentencing decisions which are subject to limited and inadequate appellate review under rule 65B of the Utah Rules of Civil Procedure. We decline to address these additional claims because of our general rule that "issues not raised at trial cannot be argued for the first time on appeal." *State v. Lopez*, 886 P.2d 1105, 1113 (Utah 1994). This rule applies to all claims, including constitutional questions, unless the petitioner demonstrates that "plain error" occurred or "exceptional circumstances" exist. *Id.* Monson has not attempted to demonstrate the applicability of either exception, and we therefore do not reach the claims that he failed to raise in his original or amended petition and that were not addressed by the district court.

▆▆▆ Returning to the claims that Monson properly raises on appeal, we first state the relevant standard of review. "When re-

---

2. Although Monson filed his amended petition prior to the issuance of our decision in *Labrum v. State Board of Pardons*, 870 P.2d 902 (Utah 1993), he waited until after *Labrum* to request access to his file and did so, not by amending his petition, but by asking the district court for an order compelling the Board to release his file. On appeal, he does not challenge the district court's denial of that motion but contends that *Labrum* dictates that he should have received his file prior to the November 1992 rehearing. However, Monson did not complain of the lack of access to his file in his original or amended petition, which were both filed prior to the *Labrum* decision. Thus, his subsequent request for his file does not qualify for the retroactive relief announced in *Labrum*, which was specifically limited to "a claim [then] pending in the district court or on appeal before this court ... challenging original parole grant hearing procedures on due process grounds." *Id.* at 914. In short, because Monson's request for his file was not pending before *Labrum* was issued but was raised only after that time, he is not entitled to the benefit of our decision in *Labrum*.

3. Monson does not specify whether this claim is based on the speedy trial clause of the United States Constitution, *see* U.S. Const. amend. VI, or of the Utah Constitution, *see* Utah Const. art. I, § 12. Because we do not address this argument, we need not resolve this point.

viewing an appeal from a dismissal of a petition for a writ of habeas corpus, we accord no deference to the conclusions of law that underlie the dismissal. They are reviewed for correctness." *Neel v. Holden*, 886 P.2d 1097, 1100 (Utah 1994); *accord Smith v. Cook*, 803 P.2d 788, 790 (Utah 1990). In addition, "while 'we must review the fairness of the *process* by which the Board undertakes its sentencing function, ... we do not sit as a panel of review on the result.'" *Neel*, 886 P.2d at 1100 (quoting *Lancaster v. Utah Bd. of Pardons*, 869 P.2d 945, 947 (Utah 1994)).

■ We first address Monson's claim that Utah's indeterminate sentencing scheme constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.[4] Monson does not contend that the trial court erred in imposing an indeterminate sentence, but rather that the Board's unfettered discretion may be used to set release dates which allow for punishment disproportionate to the severity of the offense committed. He claims that indeterminate sentencing as implemented by the Board subjects prisoners to "mentally" cruel and unusual punishment because (i) they may not be informed of the actual amount of time they must serve for long periods of time; (ii) it allows the Board to rely on unadjudicated allegations of wrongdoing and ex parte communications in determining the length of incarceration; and (iii) it gives the Board unfettered discretion in determining periods of incarceration despite the minimum terms suggested by the Guidelines. We read these points essentially as claiming that when the Board's discretion is not bounded by the Guidelines, the terms of incarceration it imposes may be excessive. Similarly, Monson argues that his term of fourteen years of confinement, as ordered by the Board, is unconstitutionally excessive because it exceeds the six-year term suggested by the Guidelines.

■ We reject these contentions insofar as they are premised on the concept that the Guidelines create a liberty interest or an "expectation of release" such that the Board's departure from them could amount to cruel and unusual punishment. We have previously said that "any 'expectation of release' derived from the [G]uidelines is at best tenuous" because they do not have the force and effect of law. *Preece v. House*, 886 P.2d 508, 511 (Utah 1994) (citing *Labrum v. State Bd. of Pardons*, 870 P.2d 902, 908 (Utah 1993)); *see also Foote v. Utah Bd. of Pardons*, 808 P.2d 734, 735 (Utah 1991). In this case, as is typical, Monson received an indeterminate sentence of six years to life. The Board, in exercising its discretion, could have denied Monson any parole date, with the consequence that he would have had to serve the maximum term of life in prison. If we were to credit Monson's argument that the Board's departure from the Guidelines in his and other cases amounts to the imposition of an excessive punishment, we would, in effect, transform Utah's indeterminate sentencing scheme into a scheme of determinate sentences fixed by the Guidelines. This we refuse to do. "[S]o long as the period of incarceration decided upon by the board of pardons falls within an inmate's applicable indeterminate range, ... then that decision, absent unusual circumstances, cannot be arbitrary and capricious." *Preece*, 886 P.2d at 512. Likewise, we do not think that the Board's decision to permit an inmate to serve *less* than the maximum term of his or her sentence can constitute cruel and unusual punishment, absent a showing that a particular parole decision results in a term of incarceration that is grossly excessive, as we define that term below. We therefore reject Monson's claims as to the Board's parole decisions generally.

■ We now address Monson's claim that his own term of fourteen years is unconstitutionally excessive. We reject this claim because Monson has not made the requisite

---

4. Monson also asserted in his brief that Utah's sentencing scheme violates due process protections contained in the Utah Constitution. However, Monson's brief contains no argument specific to this claim and fails to cite to any "authorities, statutes, and parts of the record relied upon" in violation of rule 24(a)(9) of the Utah Rules of Appellate Procedure. Accordingly, we do not address this issue. *Walker v. U.S. General, Inc.*, 916 P.2d 903, 908 (Utah 1996).

showing to support it. When an inmate claims that his or her parole date decision imposes an excessive punishment, the inmate's "challenge must meet the test for cruel and unusual punishment in specific applications: 'whether the sentence imposed in proportion to the offense committed is such as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances.'" *State v. Russell*, 791 P.2d 188, 190 (Utah 1990) (quoting *State v. Bastian*, 765 P.2d 902, 904 (Utah 1988)). Because the Guidelines do not have the force and effect of law, mere comparison of a term set by a parole decision to the minimum term suggested by the Guidelines is insufficient to meet this test. Rather, an inmate must demonstrate that his or her parole decision results in an actual sentence that is disproportionate by reference to the following three factors: "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *State v. Bishop*, 717 P.2d 261, 269 (Utah 1986) (citing *Solem v. Helm*, 463 U.S. 277, 292, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637 (1983)). Although both below and on appeal Monson set forth these factors and asserted that terms of imprisonment imposed by the Board are generally disproportionate in light of these factors, he presented *no* evidence to support this assertion. We have previously refused to address claims under analogous circumstances, i.e., when an appellant fails to properly cite to the record, under the justification that "a 'reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research.'" *Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Pipeline Operating Co.*, 909 P.2d 225, 230–31 (Utah 1995) (quoting *State v. Bishop*, 753 P.2d 439, 450 (Utah 1988) (additional citation omitted)). That justification applies with even more force in the present case because any showing that Monson could make would critically depend on factual research into terms of imprisonment for specific offenses in Utah and in other states. It is not this court's role to conduct factual research on behalf of a party, and absent that research, we refuse to consider Monson's claim that his fourteen-year term of incarceration for second degree murder is unconstitutionally cruel and unusual punishment.

We next address Monson's claims concerning restitution. First, he contends that the Board lacks constitutional authority to order restitution as a condition of parole. We disagree. At the time of Monson's crime, sentencing, and 1992 parole rehearing, article VII, section 12 of the Utah Constitution provided in pertinent part:[5]

Until otherwise provided by law, ... a Board of Pardons, ... *upon such conditions as may be established by the Legislature,* may remit fines and forfeitures, commute punishments, and grant pardons after convictions, in all cases except treason and impeachments, subject to such regulations as may be provided by law, relative to the manner of applying for pardons; but no fine or forfeiture shall be remitted, and no commutation or pardon granted, except after a full hearing before the Board, in open session, after previous notice of the time and place of such hearing has been given. The proceedings and decisions of the Board, with the reasons therefor in each case, together with the dissent of any member who may disagree, shall be reduced to writing, and filed with all papers used upon the hearing, in the office of such officer as provided by law.

Utah Const. art. VII, § 12 (1992) (emphasis added). Monson claims that because the constitution does not specifically permit the Board to order restitution, it may not do so. Thus, Monson essentially argues the maxim "expressio unius est exclusio alterius," that

5. We note that a 1992 amendment, which took effect on January 1, 1993, essentially rewrote article VII, section 12 of the Utah Constitution. We do not address the text of the 1992 amendment in this opinion because it applies only prospectively and is therefore not relevant to Monson's claims concerning the 1992 parole rehearing. *State v. Wacek*, 703 P.2d 296, 297–98 (Utah 1985) (per curiam) ("A constitutional amendment is to be given only prospective application, unless the intent to make it retrospective clearly appears from its terms.").

is, "the expression of one thing is the exclusion of another." *Black's Law Dictionary* 581 (6th ed. 1990). We have endorsed this principle only as an aid to constitutional and statutory interpretation, not as a rule of law. *Cullum v. Farmers Ins. Exch.*, 857 P.2d 922, 924 (Utah 1993). Indeed, we have recognized that " 'it is a valuable servant, but a dangerous master.' " *Id.* at 924 n. 6 (quoting *Rio Grande Motor Way, Inc. v. Public Serv. Comm'n,* 21 Utah 2d 377, 445 P.2d 990, 992 (1968) (additional citation omitted)). Rather, the critical aspect of any constitutional interpretation is to "divin[e] the intent and purpose of the framers," *Society of Separationists v. Whitehead,* 870 P.2d 916, 921 n. 6 (Utah 1993), and rules of statutory interpretation exist only to assist in this determination. *Cullum,* 857 P.2d at 924. Specifically, the maxim appropriately applies " 'only where in the natural association of ideas the contrast between a specific subject matter which is expressed and one which is not mentioned leads to an inference that the latter was not intended to be included within the statute.' " *Id.* (quoting 82 C.J.S. *Statutes* § 333, at 670 (1953)).

We reject the argument that the language of article VII, section 12 leads to the inference that the Board may not order restitution. The constitutional language plainly states that the Board, *"upon such conditions as may be established by the Legislature,* may ... commute punishments, and grant pardons after convictions." Utah Const. art. VII, § 12 (1992) (emphasis added). We have held that this language confers plenary authority on the Board to impose conditions of parole, even absent legislation specifying particular conditions. *Mansell v. Turner,* 14 Utah 2d 352, 384 P.2d 394, 395 (1963) (upholding Board's imposition of banishment as condition of parole). We explained that "[t]he prisoner may reject the conditions and serve out his term," and we noted that if a condition should be unconstitutional, the prisoner need not accept it, in which event "there *is* no condition, and the sentence would have to be served." *Id.* 384 P.2d at 395 & n. 4.

We see no reason to depart from this interpretation of the constitutional language, and we reject Monson's suggested interpretation to the contrary. Therefore, we conclude that the absence of the term "restitution" from the constitutional provision setting forth the Board's powers does not preclude the Board from ordering restitution as a condition of parole.[6]

Moreover, in 1985, the legislature established the statutory authority for the Board to impose restitution as a condition of parole by amending section 77–27–5 of the Utah Code. Board of Pardons Amendments, ch. 213, § 1, 1985 Utah Laws 597, 597. That statutory authority. provides in pertinent part:

> In determining when, where, and under what conditions offenders serving sentences may be released upon parole, pardoned, have restitution ordered, or have their fines and forfeitures remitted, or their sentences commuted or terminated, *the Board of Pardons shall consider whether the persons have made or are prepared to make restitution as ascertained in accordance with the standards and procedures of Section 76–3–201, as a condition of any parole,* pardon, remission of fines or forfeitures, or commutation or termination of sentence.

*Id.* (emphasis added); *accord* Utah Code Ann. § 77–27–5. Thus, because the Utah Constitution expressly allows the legislature to establish conditions of parole and section 77–27–5 of the Code indicates that the legislature considers restitution to be "a condition of any parole" which the Board "shall consider," we reject Monson's argument that the constitution precludes the Board from ordering restitution. To the contrary, because the Board's statutory authority became effective on April 29, 1985, before Monson pleaded guilty and was sentenced, and before the Board held his 1992 parole rehearing, the Board had express statutory authority at his parole rehearing to order restitution as a condition of his parole.

---

6. We also note that article VII, section 12 of the constitution omits the word "parole," yet Monson does not claim that the Board lacks constitutional authority to order parole. This omission supports our interpretation that the omission of express language authorizing the Board to order restitution does not bar the Board from doing so.

 Monson next contends that because the amended version of section 77–27–5 was not in effect at the time he murdered Kerby in the fall of 1984, it was applied retroactively in violation of article I, section 18 of the Utah Constitution and article I, section 10 of the United States Constitution, both of which prohibit ex post facto laws. We disagree. An ex post facto law is one that " 'punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with a crime of any defense available according to law at the time when the act was committed.' " *State v. Norton*, 675 P.2d 577, 585 (Utah 1983) (quoting *Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) (additional citation omitted)), *cert. denied*, 466 U.S. 942,. 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984), *overruled on other grounds, State v. Hansen*, 734 P.2d 421 (Utah 1986). Monson relies on the second clause of this definition when he argues that the order of restitution increased his punishment beyond the period of incarceration ordered by the trial court.

However, the Board's assessment of restitution under section 77–27–5 as a condition of parole does not increase Monson's punishment because, under the law in effect at the time he committed his crime, a trial court could have ordered both incarceration *and* restitution. *See* Utah Code Ann. § 76–3–201. Thus, Monson had no accrued right to a sentence that excluded restitution. *See Norton*, 675 P.2d at 585–86. That the legislature later conferred the procedural authority on the Board to order restitution as a condition of parole as part of the Board's inherent sentencing function, *see Labrum*, 870 P.2d at 911, does not diminish the fact that the possibility existed at the time of Monson's crime that he would be ordered to pay restitution. *Norton*, 675 P.2d at 585–86. Accordingly, the amendment of section 77–27–5 did not change the sentencing alternatives which existed at the time he committed his crime. *See id.* at 586. Therefore, application of . section 77–27–5 to Monson does not violate constitutional prohibitions against ex post facto laws.

Moreover, the Board's order of restitution did not increase or make more burdensome the sentence imposed by the trial court. Rather, the Board offered Monson an alternative to the maximum life term to which he was otherwise subject. It is analytically impossible for us to place a monetary value on time spent in prison. Thus, the parole alternative, which combines a term of fourteen years with the payment of restitution, cannot be said to exceed the maximum life term imposed by the trial court. Therefore, we cannot conclude that the statute permitting the Board to order restitution constitutes an ex post facto law which "makes more burdensome the punishment for a crime, after its commission." *Id.* at 585.

 For similar reasons, we reject Monson's next contention, that the Board's order of restitution subjects him to double jeopardy. The Fifth Amendment of the United States Constitution provides that no person "shall ... be subject for the same offense to be twice put in jeopardy of life or limb." The Utah Constitution also prohibits double jeopardy. *See* Utah Const. art. I, § 12 ("[N]or shall any person be twice put in jeopardy for the same offense."). Although Monson does not specify which of these provisions he relies upon, his argument is based solely upon federal cases construing the federal clause, and we therefore analyze this issue solely as a claim under the United States Constitution and federal law. *See State v. Wood*, 868 P.2d 70, 90 n. 4 (Utah 1993) (declining to reach state constitutional double jeopardy claim when appellant failed to argue for different interpretation under state law).

 One of the purposes of the prohibition against double jeopardy is to protect a defendant against the infliction of multiple punishments for the same offense. *State v. Holland*, 777 P.2d 1019, 1023 (Utah 1989) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)); *accord State v. Franklin*, 735 P.2d 34, 35 (Utah 1987). Monson contends that subjecting him to both imprisonment and restitution constitutes multiple punishments. We disagree because we do not consider the restitution ordered in this case to be "punishment." In *United States v. Halper*, 490 U.S.

435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), the Supreme Court considered "whether and under what circumstances a civil penalty may constitute 'punishment' for the purposes of double jeopardy analysis." [7] *Id.* at 436, 109 S.Ct. at 1895. The Court held that "a defendant who already has been punished ... may not be subjected to an additional civil sanction *to the extent* that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." *Id.* at 448–49, 109 S.Ct. at 1902 (emphasis added). The sole test to be used in making this determination requires a court, on a case-by-case basis, to compare the harm suffered as a result of a defendant's conduct with the size of the civil penalty. *Id.* at 449–50, 109 S.Ct. at 1902–03; *see also United States v. Ursery,* ── U.S. ──, ──–── & n. 2, 116 S.Ct. 2135, 2145–47 & n. 2 135 L.Ed.2d 549, 564–66 & n. 2 (1996) (summarizing *Halper*). If the amount of the penalty is so grossly excessive that it cannot be fairly characterized as compensatory or remedial, then the penalty can be considered "punishment." *See Halper,* 490 U.S. at 448–50, 109 S.Ct. at 1901–03.

Applying that test in the instant case, it is clear from the legislative scheme that restitution is not a "punishment" but a civil penalty whose purpose is entirely remedial, i.e., to compensate victims for the harm caused by a defendant and whose likely intent is to spare victims the time, expense, and emotional difficulties of separate civil litigation to recover their damages from the defendant. We briefly summarize the relevant statutory provisions supporting this conclusion.

The Board is required to consider restitution in accordance with the standards and procedures set forth in section 76–3–201 of the Utah Code.[8] Utah Code Ann. § 77–27–5(5). We turn first to that section which defines restitution as "full, partial, or nominal payment for pecuniary damages to a victim." *Id.* § 76–3–201(1)(d). A victim, in turn, is "any person [who] the court determines has suffered pecuniary damages as a result of the defendant's criminal activities." *Id.* § 76–3–201(1)(e)(i). Lastly, pecuniary damages are

> all special damages, but not general damages, which a person could recover against the defendant *in a civil action* arising out of the facts or events constituting the defendant's criminal activities and includes the money equivalent of property taken, destroyed, broken, or otherwise harmed, and losses including earnings and medical expenses.

*Id.* § 76–3–201(1)(c) (emphasis added). Plainly, these definitional provisions limit restitution to that amount which is necessary to compensate a victim for losses caused by the defendant. In addition, section 76–3–201.2, which provides that an order of restitution does not bar a later civil suit against a defendant and cannot be used as evidence in such a suit, nonetheless provides that "the court shall credit any restitution paid by the defendant to a victim against any judgment in favor of the victim in the civil action." Thus, under the statutory scheme, the damages awarded in a separate civil suit cannot duplicate the damages a victim receives through court- or Board-ordered restitution, thus ensuring that restitution serves only its compensatory purpose. Finally, the Board is limited to ordering restitution "in an amount not to exceed the pecuniary damages to the victim or victims of the offense of which the defendant has been convicted, or the victim of any other criminal conduct admitted to by the defendant to the sentencing court." *Id.* § 77–27–7(2). From the foregoing provi-

---

**7.** The Board initially argues that double jeopardy principles do not apply to Board parole proceedings because they are civil in nature. It relies on our statement that "double jeopardy principles apply only in criminal cases." *In re McCune,* 717 P.2d 701, 707 (Utah 1986). However, recent federal case law clarifies that no "absolute and irrebuttable rule" exists that a civil penalty cannot be punishment for the purposes of double jeopardy analysis. *United States v. Halper,* 490 U.S. 435, 442, 109 S.Ct. 1892, 1898, 104 L.Ed.2d 487 (1989). We therefore decline to adopt the criminal/civil distinction urged by the Board, and

to the extent our prior cases suggested that such a distinction was a dispositive factor in double jeopardy analysis, we hereby disavow them.

**8.** Section 76–3–201 of the Code has been internally renumbered since Monson's 1992 parole rehearing. For clarity, we refer in this opinion to subsection numbers as they appear in the current version of the statute. These substantive provisions are identical to those which were contained in the 1992 version of the statute. *See* Utah Code Ann. § 76–3–201 (Supp.1992).

sions, it is evident that restitution, when ordered by the Board, is indistinguishable from compensatory civil damages, and we therefore do not construe it as a "punishment" for double jeopardy purposes.

 We now address Monson's last claim pertaining to restitution, which is that the Board failed to comply with proper procedures when it ordered restitution. Specifically, Monson claims that the Board failed to consider the statutory standards set forth in section 76–3–201 as it is directed to do by section 77–27–5 and that he was denied a hearing on the restitution issue. The Board counters that these issues are not ripe for appellate review because the Board has not yet determined the amount of restitution to be ordered and that it may ultimately determine that no restitution is due, thus rendering the issue moot.

We first address the standards that the Board must apply in ordering restitution. Section 77–27–5 of the Code provides in pertinent part:

> In determining when, where, and under what conditions offenders serving sentences may be paroled ... [or] have restitution ordered, ... the Board of Pardons and Parole shall consider whether the persons have made or are prepared to make restitution *as ascertained in accordance with the standards and procedures of Section 76–3–201,* as a condition of any parole....

Utah Code Ann. § 77–27–5(5) (emphasis added). Section 76–3–201 requires that trial courts take into account certain factors in determining whether to order complete, partial, or nominal restitution. These factors are:

> (i) the financial resources of the defendant and the burden that payment of restitution will impose, with regard to the other obligations of the defendant;
>
> (ii) the ability of the defendant to pay restitution on an installment basis or on other conditions to be fixed by the court;

> (iii) the rehabilitative effect on the defendant of the payment of restitution and the method of payment; and (iv) other circumstances which the court determines make restitution inappropriate.

Utah Code Ann. § 76–3–201(4)(c). In addition, section 76–3–201 provides, "When the court determines that restitution is appropriate or inappropriate under this subsection, the court shall make the reasons for the decision a part of the court record." *Id.* § 76–3–201(4)(d)(i). We agree that the language of section 77–27–5 mandates that the Board must follow both the substantive standards of section 76–3–201 and its procedural requirements. It must not only consider the four statutory factors when it orders restitution as a condition of parole, but it must also comply with the same procedural requirements imposed on a trial court, e.g., it shall make a record of the reasons for its decision.

 The record in this case does not demonstrate that the Board considered the statutory factors because it does not contain any explanation of the reasons the Board ordered Monson to pay restitution. The most likely explanation for this lack is that the Board had not yet determined the amount of restitution it would ultimately require. Nonetheless, in issuing its order, the Board has not met the statutory requirements. As a result, Monson appropriately sought extraordinary relief. *See Preece,* 886 P.2d at 511–12. We therefore reject the Board's contention that this issue is not ripe for review. The appropriate remedy for the Board's error, however, is not to vacate the order of restitution, as Monson suggests, but to order the Board to comply with the statute by giving Monson an explanation of its decision which demonstrates that it has taken into account the appropriate statutory factors. *Id.* at 512. In so doing, the Board will no doubt determine the amount of restitution to be ordered.[9] We therefore reverse the district court's decision insofar as it found

---

9. In making its determination, the Board may (i) request that the Department of Corrections investigate and file a written report on the amount of restitution that is appropriate in light of the statutory factors, and (ii) hold a hearing on the issue at which the inmate and the victim(s), after appropriate notice and access to the investigative report and other materials, may present evidence. Utah Admin. Code R671–403–2 (1992).

that the Board did not err in ordering restitution.

■ We next address Monson's contention that he was denied a hearing on the restitution issue. Monson again relies on section 76-3-201(4)(e), made applicable to the Board by virtue of section 77-27-5. Section 76-3-201(4)(e) provides, "If the defendant objects to the imposition, amount, or distribution of the restitution, the court shall at the time of sentencing allow him a full hearing on the issue." We agree that this provision applies fully to the Board. It requires that after restitution is ordered and after an inmate objects to the order, the Board must hold a "full hearing" on the inmate's objections. That did not occur in this case because Monson did not object to the order of restitution and did not request that the Board hold a hearing. Instead, he filed his petition for extraordinary relief in the district court. We therefore find no error in the Board's failure to hold a hearing on the restitution issue.[10] However, if the Board later amends its order to specify an amount of restitution and Monson objects to the imposition, amount, or distribution of the restitution so ordered, he will then be entitled to a full hearing on his objection.[11]

Finally, we turn to Monson's contentions that the Board violated his due process rights by denying him legal counsel at the 1992 rehearing, not allowing him to present witnesses, and failing to give an adequate rationale for its parole decision. We address these issues in order.

■ We reject Monson's first claim that the Sixth Amendment to the United States Constitution guarantees him the effective assistance of counsel at a parole rehearing. The amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of counsel for his defence." U.S. Const. amend. VI. Monson's argument is premised on our state-

ments that in setting an original parole date, the Board performs a function analogous to that of a trial judge in jurisdictions that have a determinate sentencing scheme. *See, e.g., Labrum,* 870 P.2d at 908; *Foote,* 808 P.2d at 735. He therefore reasons that he was entitled to the effective assistance of counsel in reliance on our cases and federal cases that have suggested or held that a defendant has a Sixth Amendment right to counsel when a trial court imposes a criminal sentence. *See, e.g., Mempa v. Rhay,* 389 U.S. 128, 135, 88 S.Ct. 254, 257, 19 L.Ed.2d 336 (1967); *State v. Casarez,* 656 P.2d 1005, 1007 (Utah 1982) ("Sentencing is a critical stage of a criminal proceeding at which a defendant is entitled to the effective assistance of counsel.").

■ Our cases, however, have not said that an original parole grant hearing is identical for all purposes to a sentencing hearing before the trial court. Rather, we have said, "The reality of original release hearings is that they are analogous to sentencing hearings and *require due process to the extent that the analogy holds.*" *Labrum,* 870 P.2d at 908 (emphasis added). In holding that due process requirements based on article I, section 7 of the Utah Constitution may apply to certain parole proceedings, we necessarily rejected the categorization of parole proceedings as "criminal proceedings" to which other constitutional rights, including the Sixth Amendment right to counsel in criminal prosecutions, might categorically attach. Because it is well settled that the Sixth Amendment right to counsel is not implicated in noncriminal proceedings, *Neel,* 886 P.2d at 1103, we hold that the amendment does not require the effective assistance of counsel at parole grant hearings, including the rehearing at issue here. *Cf. Gagnon v. Scarpelli,* 411 U.S. 778, 787-90, 93 S.Ct. 1756, 1762-64, 36 L.Ed.2d 656 (1973) (finding no constitutional right to counsel in parole revocation

---

10. Moreover, we do not construe the Board's own regulations as requiring it to hold a hearing *prior* to ordering restitution. The procedure set forth in administrative rule 671-403-2 for a preorder hearing is clearly discretionary, because it states, "A restitution hearing *may* be conducted by a Board panel or hearing officer."

Utah Admin. Code R671-403-2 (1992) (emphasis added).

11. Because a postorder hearing was not held in this case, it would be premature for us to address the due process protections that the Board may be required to give an inmate at such a hearing.

proceedings but holding that due process may require counsel in certain cases).

■■■ To the extent that due process guarantees under the Utah Constitution may apply to Monson's 1992 rehearing,[12] he has failed to show how the "participation of counsel at the hearing would have affected the accuracy of the information considered by the Board." *Neel*, 886 P.2d at 1103. Such a showing is necessary because our decision to extend particular procedural due process requirements under article I, section 7 of the Utah Constitution to certain parole hearings is grounded in the rationale that such requirements will substantially further the accuracy and reliability of the Board's fact-finding process. *Id.* Therefore, if an inmate fails to demonstrate how a particular procedural requirement will substantially further the Board's fact-finding process, we have no basis for concluding that a failure to provide that procedure operated to deny the inmate due process. *Id.* Here, Monson never asked the Board for the assistance of counsel and has not even attempted to make the requisite showing as to how counsel would have substantially assisted the factfinding process. Therefore, we cannot conclude that he was denied due process because he lacked counsel at the 1992 rehearing.[13]

■■■ For the same reason, we cannot conclude that Monson was denied due process because he was unable to call witnesses on his own behalf. He argues that because oral testimony is more persuasive than written testimony, and because Kerby's relatives were allowed to testify, he should have been able to offer the oral testimony of witnesses

favorable to him. Even if we were to accept Monson's theory that oral testimony is more persuasive than written testimony, which we do not on this record, Monson has failed to show how the persuasive value of a particular method of presenting witness testimony has anything to do with substantially furthering the accuracy and reliability of the Board's fact-finding process. In addition, we note that Board regulations in effect at the time of the 1992 parole rehearing provided, "An offender has the right to be present at a parole grant, rehearing, rescission, or parole violation hearing [and] may speak on his own behalf, present documents, ask, and answer questions." Utah Admin. Code R671–301–2 (1992). From the record, it does not appear that Monson attempted to introduce any documents containing witness testimony to further the Board's fact-finding process; as a result, we have no basis for concluding that he was denied due process simply because he was not allowed the opportunity to present oral witness testimony. Furthermore, even if Monson had attempted to present such documents and the Board had refused to admit them, Monson would still have the burden of showing that such refusal was not only error, but was harmful, a burden which he has not met in this case. *See State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992).

■■■ Lastly, we address Monson's claim that he was denied due process because he did not receive a detailed written explanation of the Board's parole decision following the 1992 rehearing.[14] He claims that he was entitled to such an explanation in accordance with the Board's rules and our decision in *Preece*, in which we held that the Board must

12. Although the 1992 rehearing was not technically an original parole grant hearing, it was the first hearing at which Monson's release date was determined. We have stated, "Until that initial term is set, any proceeding at which the issue is considered must be perceived as a threat to the prisoner's liberty," *Neel*, 886 P.2d at 1101, and we extended the benefit of our decision in *Neel* "to those parole hearings at which an inmate's release date is fixed or extended." *Id.; see also* Utah Admin. Code R671–301–2 (1992) ("In rehearings, the offender is afforded all the rights and considerations in the initial hearing except as provided by other Board policies because the setting of a parole date is still at issue."). Therefore, for purposes of this appeal, we treat Mon-

son's 1992 rehearing as a proceeding in which due process guarantees apply.

13. Contrary to the implication of Justice Stewart's dissent, we have not categorically rejected a claim for assistance of counsel under the Utah Constitution's due process guarantees. We have held only that in this case Monson has failed to show that the denial of counsel met the standard of *Neel.* 886 P.2d at 1103.

14. We have already ruled that the Board erred in ordering restitution without providing an adequate written explanation; therefore, we read this claim as focusing on the adequacy of the Board's rationale for its release date decision.

comply with its own rules. *Preece,* 886 P.2d at 511–12. The Board's rule in effect at the time of the rehearing required that an "explanation of the reasons for [a] decision [be] given and supported in writing." Utah Admin. Code R671–305–2 (1992) (current version at Utah Admin. Code R671–305–1). Monson concedes that he received a preprinted form on which the Board checked off its reasons for its parole decision. The Board checked off five "aggravating" factors related to Monson's crime and six "mitigating" factors related to Monson's present characteristics. While perhaps not a perfect explanation of the Board's rationale, this document nonetheless satisfies the Board's own requirement that it provide a written explanation of the reasons for its decision. Because Monson has failed to identify with any particularity the type of detail he claims he should have received and has failed to show that such lack of detail was harmful to him, and because he received a written explanation, we conclude that he was not denied due process.

In summary, we affirm the district court's dismissal of Monson's claims in his petition for extraordinary relief, except the claim that the Board failed to provide an explanation of its decision to order restitution which takes into account the statutory factors set forth in section 76–3–201 of the Code. As to this claim, we remand for the entry of an order directing the Board to comply with the proper statutory procedure.

RUSSON, J., concurs in Chief Justice ZIMMERMAN's opinion.

HOWE, J., concurs in the result.

STEWART, Associate Chief Justice, dissenting:

I agree with the majority opinion except with respect to one critical ruling: the right of an inmate to be represented by counsel at the original release hearing, which in most cases determines for practical matters the length of time a prisoner's sentence will run. The majority holds that a prisoner has no such right. I firmly believe that a prisoner does have such a right.

In *State v. Casarez,* 656 P.2d 1005 (Utah 1982), we stated, "Sentencing is a critical stage of a criminal proceeding *at which a defendant is entitled to the effective assistance of counsel." Id.* at 1007 (emphasis added); *see also Mempa v. Rhay,* 389 U.S. 128, 137, 88 S.Ct. 254, 258, 19 L.Ed.2d 336 (1967). This Court has clearly recognized the essential similarities between the judicial sentencing proceeding and an original parole grant hearing before the Board of Pardons. In *Foote v. Board of Pardons,* 808 P.2d 734, 735 (Utah 1991), we stated:

> If the trial judge sends the defendant to prison, the judge does not determine the number of years the defendant will spend there. That is left to the unfettered discretion of the board of pardons, which performs a function analogous to that of the trial judge in jurisdictions that have a determinate sentencing scheme.

In *Labrum v. State Board of Pardons,* 870 P.2d 902, 910–11 (Utah 1993), we held that criminal parole grant hearings are legally different from other parole proceedings, that the original parole grant proceeding is essentially a sentencing proceeding, and that the state due process clause applies thereto. Although the issue presented in *Labrum* was not whether one who had been convicted of a crime and sentenced by a court was entitled to counsel in the original parole grant hearing, the issue before the Court was the analogous issue of whether an inmate was entitled to due process of law in an original parole grant hearing. The Court stated, "The reality of original release hearings [i.e., original parole grant hearings] is that they are analogous to sentencing hearings and require due process to the extent that the analogy holds." *Id.* at 908.

A number of considerations strongly militate in favor of recognizing the right of a prisoner to counsel in an original parole grant hearing. One such factor is the necessity of avoiding factual errors in the Parole Board's decisions. As Justice Durham wrote in *Labrum:*

> Justice Marshall of the United States Supreme Court elaborated on the problem in the parole context in his dissent in *Greenholtz v. Nebraska Penal Inmates,*

442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979):

> In fact, researchers and courts have discovered many substantial inaccuracies in inmate files, and evidence in the instant case revealed similar errors.... In this case, for example, the form notifying one inmate that parole had been denied indicated that the Board believed he should enlist in a self-improvement program at the prison. But in fact, the inmate was already participating in all such programs available.... Such errors in parole files are not unusual. *E.g. Kohlman v. Norton,* 380 F.Supp. 1073 (Conn.1974) (parole denied because file erroneously indicated that applicant had used gun in committing robbery); *Leonard v. Mississippi State Probation and Parole Board,* 373 F.Supp. 699 (N.D.Miss.1974), *rev'd,* 509 F.2d 820 (CA5), *cert denied,* 423 U.S. 998 [96 S.Ct. 428, 46 L.Ed.2d 373] (1975) (prisoner denied parole on basis of illegal disciplinary action); *In re Rodriguez,* 14 Cal.3d 639 [122 Cal.Rptr. 552], 537 P.2d 384 (1975) (factually incorrect material in file led parole officers to believe that prisoner had violent tendencies and that his "family reject[ed] him"); *State v. Pohlabel,* 61 N.J.Super. 242, 160 A.2d 647 (1960) (files erroneously showed that prisoner was under a life sentence in another jurisdiction); Hearings on H.R. 13118 et al. before Subcommittee No. 3 of the House Judiciary Committee, 92d Cong., 2d Sess., pt. VII–A, p. 451 (1972) (testimony of Dr. Willard Gaylin: "I have seen black men listed as white and Harvard graduates listed with borderline IQ's"); S. Singer & D. Gottfredson, Development of Data Base for Parole Decision–Making 2–5 (NCCD Research Center, Supp. Report 1, 1973) (information provided by FBI often lists same charge six or seven times without showing a final disposition).

*Id.,* 442 U.S. at 33 & n. 15, 99 S.Ct. at 2117 & n. 15 (Marshall, J., dissenting).

*Labrum,* 870 P.2d at 909–10.

The *Labrum* opinion also refers to another factor that weighs heavily in favor of recognizing a right of counsel at original parole hearings:

> Accuracy and fairness are essential in proceedings which impinge as directly on personal liberty as original parole grant hearings.
>
> The interests of both society and criminal offenders are best served when fairness and accuracy are assured at all stages of the sentencing and correctional process. An offender's perception of fairness in the criminal justice system is thought to promote rehabilitation. Accurate sentencing and parole decisions also further society's interest in ensuring that offenders will be returned to society neither sooner nor later than is appropriate.
>
> Finally, the criminal justice system as a whole values and protects accuracy and the appearance of fairness.... For the approximately ninety percent of all criminal defendants who plead guilty, ... sentencing and parole represent the primary basis for evaluating the fairness of the criminal justice system.

Note, *A Proposal to Ensure Accuracy in Presentence Investigation Reports,* 91 Yale L.J. 1225, 1241–42 (1982).

*Labrum,* 870 P.2d at 910.

The majority opinion incorrectly indicates that by holding the due process clause of the Utah Constitution applicable to initial parole determination hearings, "we necessarily rejected the categorization of parole proceedings as 'criminal proceedings' to which other constitutional rights, including the Sixth Amendment right to counsel in criminal prosecutions, might categorically attach." That is simply not, in my view, correct. Of course, parole *termination* proceedings are, according to a long line of cases, civil in nature. The Court did, however, in *Labrum,* make quite clear that the original parole grant hearing in which a "parole release date" is set is "inherently a sentencing function." *Id.* at 911. Furthermore, the Court's rejection of plaintiff's position in this case on the ground that he had failed to show that the participation of counsel at the hearing "would have affected the accuracy of the information considered by the court" begs the essential

question. It is the appearance of counsel that enables a convicted person to show inaccuracy or mistakes in the Board's sentencing proceedings. The failure of this plaintiff, unaided by counsel, to do so is hardly an argument for not recognizing his right to such a fundamental aspect of a fair procedure.

In my view, an original parole grant hearing is part and parcel of the sentencing procedure in this state's indeterminate sentencing scheme, and for that reason, plaintiff is constitutionally entitled to the effective assistance of counsel in those proceedings.

For that reason, I respectfully dissent.

DURHAM, J., concurs in Associate Chief Justice STEWART's dissenting opinion.