146 P.3d 606

**Robert C. D'AMBROSIO, Petitioner–Appellant,**

v.

**STATE of Hawai'i, Respondent–Appellee.**

**No. 25961.**

Intermediate Court of Appeals of Hawai'i.

Sept. 29, 2006.

Robert C. D'Ambrosio, on the briefs, petitioner-appellant, pro se.

James M. Anderson, deputy prosecuting attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., and WATANABE, J.; with NAKAMURA, J., Concurring Separately.

Opinion of the Court by WATANABE, J.

Petitioner–Appellant Robert C. D'Ambrosio (D'Ambrosio, Mr. D'Ambrosio, Robert, or Petitioner) appeals from the findings of fact, conclusions of law, and order entered by the Circuit Court of the First Circuit (the circuit court)[1] on June 13, 2003 (the June 13, 2003 order), summarily dismissing his Hawai'i Rules of Penal Procedure (HRPP) Rule 40[2]

1. The Honorable Marie N. Milks (Judge Milks) presided.

2. Hawai'i Rules of Penal Procedure (HRPP) Rule 40 provides, in relevant part, as follows:

**POST–CONVICTION PROCEEDING.**

(a) **Proceedings and grounds.** The post-conviction proceeding established by this rule shall encompass all common law and statutory procedures for the same purpose, including habeas corpus and coram nobis; provided that the foregoing shall not be construed to limit the availability of remedies in the trial court or on direct appeal. Said proceeding shall be applicable to judgments of conviction and to custody based on judgments of conviction, as follows:

(1) FROM JUDGMENT. At any time but not prior to final judgment, any person may seek relief under the procedure set forth in this rule from the judgment of conviction, on the following grounds:

(i) that the judgment was obtained or sentence imposed in violation of the constitution of the United States or of the State of Hawai'i;

. . . .

(v) any ground which is a basis for collateral attack on the judgment.

For the purposes of this rule, a judgment is final when the time for direct appeal under Rule 4(b) of the Hawai'i Rules of Appellate Procedure has expired without appeal being taken, or if direct appeal was taken, when the appellate process has terminated, provided that a petition under this rule seeking relief from judgment may be filed during the pendency of direct appeal if leave is granted by order of the appellate court.

(2) FROM CUSTODY. Any person may seek relief under the procedure set forth in this rule from custody based upon a judgment of conviction, on the following grounds:

(i) that sentence was fully served;

. . . .

(iii) any other ground making the custody, though not the judgment, illegal.

. . . .

(f) **Hearings.** If a petition alleges facts that if proven would entitle the petitioner to relief,

Petition for Post–Conviction Relief (Rule 40 petition).

In his Rule 40 petition, D'Ambrosio alleged the following grounds for seeking post-conviction relief:

Ground one: His conviction was obtained by a guilty plea "which was unlawfully induced and not made voluntarily" because he entered into the plea agreement on the false promise that he would be represented at the hearing before the Hawaii Paroling Authority (the HPA or the paroling authority) to set his minimum term of imprisonment (minimum-term hearing) by his trial counsel, James M. Pallett (Pallett or Mr. Pallett); [3]

Ground two: He was denied the effective assistance of counsel because Pallett failed to appear at D'Ambrosio's minimum-term hearing four times and failed to advise D'Ambrosio of the HPA's Guidelines for Establishing Minimum Terms of Imprisonment (HPA Guidelines),[4] rendering D'Ambrosio's "plea deal valueless[;]"

Ground three: His conviction was obtained by an unconstitutional failure of Respondent–Appellee State of Hawai'i (the State) to disclose evidence favorable to him because the State failed to inform him that he would "fall under the Level III inmate of the [HPA] Guidelines making our plea deal valueless[;]" and

the court shall grant a hearing which may extend only to the issues raised in the petition or answer. However, the court may deny a hearing if the petitioner's claim is patently frivolous and is without trace of support either in the record or from other evidence submitted by the petitioner. The court may also deny a hearing on a specific question of fact when a full and fair evidentiary hearing upon that question was held during the course of the proceedings which led to the judgment or custody which is the subject of the petition or at any later proceeding.

The petitioner shall have a full and fair evidentiary hearing on the petition. The court shall receive all evidence that is relevant and necessary to determine the petition, including affidavits, depositions, oral testimony, certificate of any judge who presided at any hearing during the course of the proceedings which led to the judgment or custody which is the subject of the petition, and relevant and necessary portions of transcripts of prior proceedings. The petitioner shall have a right to be present at any evidentiary hearing at which a material question of fact is litigated.

Where the petition alleges the ineffective assistance of counsel as a ground upon which the requested relief should be granted, the petitioner shall serve written notice of the hearing upon the counsel whose assistance is alleged to have been ineffective and said counsel shall have an opportunity to be heard.

3. We take judicial notice that on September 2, 2005, the Hawai'i Supreme Court entered an order suspending James M. Pallett from the practice of law for five years, effective October 3, 2005, pursuant to a disciplinary proceeding.

4. The Hawaii Paroling Authority (HPA) adopted the HPA Guidelines for Establishing Minimum Terms of Imprisonment (HPA Guidelines) pursuant to Hawaii Revised Statutes (HRS) § 706–669(8) (1993), which states:

The authority shall establish guidelines for the uniform determination of minimum sentences which shall take into account both the nature and degree of the offense of the prisoner and the prisoner's criminal history and character. The guidelines shall be public records and shall be made available to the prisoner and to the prosecuting attorney and other interested government agencies.

The introduction to the HPA Guidelines that is included in the record on appeal states, in relevant part:

The purpose of minimum sentencing guidelines is to provide a degree of uniformity and consistency in the setting of minimum terms while providing the community-at-large, public policy makers and planners, the criminal justice system, and victims and offenders with information as to the criteria used in establishing minimum terms of imprisonment.

The guidelines provide a range of time and criteria within each of three levels of punishment within which decisions on minimum terms are reached. Under our system of sanctions, there needs to be adequate flexibility in the minimum setting process to account for significant differences among offenses, offenders, and the circumstances surrounding each individual's offense and commitment to prison.

In reaching a decision on a minimum term, the criteria to be taken into consideration are discussed in Part IV. While the criteria outlined are not all inclusive, they do represent the primary considerations in most cases. It should be emphasized that specific weights have not been assigned to the various criteria but the three areas of focus are:
(1) the nature of the offense;
(2) the degree of injury/loss to person or property and
(3) the offender's criminal history,
The [HPA] may deviate from the guidelines, either above or below, but all deviations shall be accompanied by written justification and be made a part of the Order Establishing Minimum Terms of Imprisonment[.]

Ground four: He is innocent of murder, guilty of manslaughter, and only pleaded guilty to murder on the erroneous legal advice of his trial counsel.

Based on our review of the record, briefs, and relevant statutory and case law, we conclude that D'Ambrosio's Rule 40 petition presented a colorable claim on Ground 2—that D'Ambrosio received ineffective assistance of counsel at his minimum-term hearing—and should not have been summarily dismissed on that ground. Accordingly, we vacate the June 13, 2003 order and remand this case to the circuit court to conduct an evidentiary hearing on that issue. In all other respects we affirm the June 13, 2003 order.

## BACKGROUND

On September 17, 1991, the State charged D'Ambrosio with committing Murder in the Second Degree, in violation of Hawaii Revised Statutes (HRS) §§ 707–701.5 (1985 & Supp.1990)[5] and 706–656 (Supp.1990),[6] for killing Song Muang Nancy Marsh (Marsh). The charge stemmed from a September 4, 1991 incident in which D'Ambrosio entered the Butterfly Lounge, where Marsh worked, and slit her throat with a knife.

Following a trial[7] held from February 8 through March 3, 1994, a mistrial was declared when the jury was unable to reach a unanimous verdict. A new trial was initially scheduled for September 12, 1994 and, following several continuances, rescheduled to February 13, 1995 before the Honorable Marie N. Milks (Judge Milks). On that date, D'Ambrosio opted to enter into a plea agreement with the State, pursuant to which he pleaded guilty as charged and the State agreed to recommend to the HPA that D'Ambrosio's minimum imprisonment term be set at ten years.

Prior to allowing D'Ambrosio to enter his guilty plea, Judge Milks engaged in an extensive colloquy with D'Ambrosio to ensure that he realized that the HPA would not be bound by the State's recommendation and could set a minimum term of imprisonment longer than ten years for D'Ambrosio:

THE COURT:. . . . Mr. D'Ambrosio, I have a two-page document here. It says "Guilty/No Contest" on the top. It's what we call a pre-printed form and there are portions that are handwritten in. In the middle of Page 2, there's a date of March 13, and there's a signature. Did you sign this?

MR. D'AMBROSIO: Yes, I did.

. . . .

THE COURT: Did you and Mr. Pallett have a chance to go over all of the parts to this document?

MR. D'AMBROSIO: Yes, we did.

. . . .

THE COURT:. . . . I'm going to be asking you questions about the form and the reason we ask is to make sure you understand what's going on to clarify any misunderstandings you might have and make sure that no one is putting pressure on you or forcing you in any way to plead. If I ask a question and you don't understand my question, can you stop me? I'll ask the question over.

MR. D'AMBROSIO: Yes.

. . . .

5. HRS § 707–701.5 (1985) provided as follows:
   **Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
   (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

6. HRS § 706–656 (Supp.1990) provided, in relevant part, as follows:
   **Terms of imprisonment for first and second degree murder and attempted first and second degree murder** . . . .

(2) Persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawaii paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

7. The Honorable Dexter D. Del Rosario presided over the jury trial.

THE COURT: Paragraph 1 says that you're going to be entering a guilty plea to the charge of Murder in the Second Degree. Do you know what it means to plead guilty?

MR. D'AMBROSIO: Yes, I do.

THE COURT: You have already gone through a trial in this case, have you not, Mr. D'Ambrosio?

MR. D'AMBROSIO: Yes.

THE COURT: So you understand all the rights that you have fighting the case and having the State prove the charges against you?

MR. D'AMBROSIO: Yes.

THE COURT: And you understand that by pleading guilty, basically, you're going to stipulate or agree that there is a sufficient basis for a judge to find the elements of Murder in the Second Degree? Is that what Mr. Pallett explained?

MR. D'AMBROSIO: Yes.

. . . .

THE COURT: Paragraph 3 says that you received a written copy of the original charge and having gone through a trial before, I would expect that you know who the witnesses are, you know essentially what the witnesses would say, and you and Mr. Pallett have discussed how you would defend against the charge, is that correct?

MR. D'AMBROSIO: That is correct.

THE COURT: And my understanding is that when you went to trial before, the jury was unable to agree to a verdict, is that correct?

MR. D'AMBROSIO: Yes.

THE COURT: The paragraph number five is marked as you're pleading guilty because you've discussed all the evidence and you've discussed the advice on the law with your lawyer and you believe that you're guilty, is that true?

MR. D'AMBROSIO: Yes.

THE COURT: Do you know what the maximum sentence is for this offense?

MR. D'AMBROSIO: I believe life with parole.

THE COURT: Did Mr. Pallett explain how life with parole works?

MR. D'AMBROSIO: Yes.

THE COURT: And how did he explain the minimum would be set? Did he tell you that the court would set the minimum or the parole authority would set the minimum?

MR. D'AMBROSIO: It was up to the paroling authority to set my minimum.

THE COURT: Now, one of the agreements that you have with regard to your plea is that you're going to plead as charged and the State is going to recommend to the paroling authority that you serve ten years before you're eligible for parole. Is that what you understand the State is going to recommend?

MR. D'AMBROSIO: Yes.

THE COURT: And do you understand that that does not mean that you have to serve a ten-year mandatory minimum? It will be up to the paroling authority and if the paroling authority wants to set less than ten, the paroling authority may do so, you understand that?

MR. D'AMBROSIO: Yes, your Honor.

THE COURT: In other words, this is not binding on the paroling authority. It is the State's recommendation which the paroling authority can either accept or reject.

MR. D'AMBROSIO: Your Honor, if I could speak, the only problem I had with the plea was I thought the plea bargain was a mandatory ten-year sentence.

THE COURT: It's not mandatory. No, it's not mandatory.

MR. D'AMBROSIO: The only problem I have with making a decision—

THE COURT: In fact, if Mr. Pallett wishes to, he can order a copy of the transcript for the paroling authority indicating that they're not bound by the State's recommendations and the court is not making any finding of any mandatory term. You also have to understand that if the paroling authority wants to impose a higher than ten years' minimum, they can do that too.

MR. D'AMBROSIO: I understand that too.

THE COURT: I don't want you to feel that they only go under ten. It will be up to the paroling authority. Did you feel that at any time Mr. Pallett was putting any pressure on you or forcing you in any way to come into court to plead?

MR. D'AMBROSIO: No, he left it totally up to myself what I wanted to do. He advised me of the possibilities on both sides.

THE COURT: And you're comfortable that he's respected your right to make your own decision on the case?

MR. D'AMBROSIO: Yes.

. . . .

THE COURT: Once you plead today, if I make a finding that your plea was entered intelligently, knowingly, and voluntarily, you cannot hereafter wait for the paroling authority to set the minimum and then come back and say I don't like the minimum sentence, I want to withdraw my plea.

MR. D'AMBROSIO: I understand that, your Honor.

THE COURT: And for that reason, we want you to really understand what's going on. So far, do you have any other questions you'd like to direct to me?

MR. D'AMBROSIO: No, I don't.

. . . .

THE COURT: The court makes the following findings. My first finding is that your plea has been entered intelligently. That means you understand the charge against you.

My second finding is that your plea has been entered knowingly and that means you know that by pleading, you face a sentence of life with parole. You know that the State is going to recommend a ten-year minimum term. You know that that is not a mandatory minimum term and that the paroling authority will be at liberty to set its own minimum term, subject to recommendation by the State.

My third finding is that your plea has been entered voluntarily. That means you're not taking the blame for anyone and that you have not been pressured or anything to extract your plea.

On May 11, 1995, D'Ambrosio was sentenced by the circuit court[8] to a maximum term of life imprisonment with the possibility of parole. At the sentencing hearing, the circuit court confirmed that it was not imposing "mandatory minimum time" and that pursuant to the stipulation between D'Ambrosio and the State, "the State will recommend a ten-year minimum" to the HPA and "the court will not make any statement with regard to the recommendation. The court will not be imposing any ten-year term at this time. It will be up to the Paroling Authority."[9]

The HPA subsequently sent D'Ambrosio a Notice of Hearing and Rights and Request for Legal Counsel. The first page of the two-paged, pre-printed form notified D'Ambrosio that the HPA would be holding a hearing in August 1995 for the "fixing of [his] minimum term of imprisonment." D'Ambrosio was also told that he would be notified of

8. Judge Milks presided.

9. At the sentencing hearing, the Circuit Court of the First Circuit (the circuit court) noted that "[a]s a repeat offender the defendant faces a period of 13 years and 4 months, but the court will impose no minimum time and defer to the [Hawaii Paroling Authority (HPA)] to set the appropriate time."

If Petitioner–Appellant Robert C. D'Ambrosio (D'Ambrosio) were a repeat offender, it is not clear to this court how he would face a mandatory minimum imprisonment term of 13 years and 4 months. Under the statute governing repeat offender sentencing at the time, a person convicted of murder in the second degree would be subject "to a mandatory minimum period of imprisonment without possibility of parole during such period" of ten years if he/she had one prior felony conviction; twenty years if he/she had two prior felony convictions; and thirty years if he/she had three or more prior felony convictions. HRS § 706–606.5(1) (1993). Pursuant to HRS § 706–606.5(1)(b), a mandatory minimum term of imprisonment of 13 years and 4 months was required to be imposed "[w]here the instant conviction is for a class A felony" and the defendant has "[t]wo prior felony convictions." Murder in the second degree is an unclassified, not a class A, felony. See HRS § 706–610(1). Therefore, if D'Ambrosio had two prior felony convictions, he would have been subject to a *mandatory* twenty-year minimum period of imprisonment *without possibility of parole* during such period. HRS § 706–606.5(1)(b)(i).

the date of the hearing and that the "Department of Public Safety will arrange for [his] appearance at a time and location to be determined." The top of page two of the notice included the following paragraph:

You are hereby advised of your rights to:

1. Consult with any person(s) you reasonably desire;

2. Be assisted and represented by counsel prior to and during your hearing;

3. Have counsel appointed for you if you so request and cannot afford to retain counsel on your own: [ (sic) ]

4. Appear in person and be heard;

5. Waive any of the above rights.

The remainder of the document required action on the part of D'Ambrosio to acknowledge and exercise the foregoing rights. That part of the document was filled out by D'Ambrosio as follows:

Having received the Notice of Hearing and Rights and Request for Legal Counsel and having read or had it read and explained to me, I fully understand it.

The following are my decisions on my rights to the above-mentioned hearing:

1. I will obtain legal counsel of my own choosing.

    ☒ Yes ☐ No *JAMES PALLET* [ (sic) ]

2. I wish to have assistance in acquiring legal services as I am not able to afford a lawyer on my own.

    ☐ Yes ☒ No

3. I consent to have the Hawaii Paroling Authority release all pertinent information to my legal counsel.

    ☒ Yes ☐ No

4. I wish to personally appear at the hearing.

    ☒ Yes ☐ No

5. I do not wish to appear but I wish to have legal counsel appear in my behalf.

    ☐ Yes ☒ No

(Formatting revised, italicized words handwritten by D'Ambrosio in the original.)

The HPA initially scheduled D'Ambrosio's hearing for August 8, 1995 and sent a notice to D'Ambrosio and Pallett of the date and location of the hearing. When Pallett failed to appear to represent D'Ambrosio, the HPA rescheduled D'Ambrosio's hearing to September 7, 1995 and, upon Pallett's failure to appear again, rescheduled the hearing to November 6, 1995. The HPA sent a notice to Pallett of each hearing. In the interim, D'Ambrosio and members of his family sought to contact and persuade Pallett to attend the scheduled hearings, but they were unsuccessful.

D'Ambrosio contends that when Pallett failed to appear for the November 6, 1995 hearing, the HPA proceeded with the hearing and waived D'Ambrosio's right to counsel.[10] Thereafter, on December 1, 1995, the HPA entered an order fixing D'Ambrosio's minimum term of imprisonment at twenty years.

On August 21, 2002, D'Ambrosio filed the Rule 40 petition that underlies this appeal. In support of his Rule 40 petition, D'Ambrosio submitted a letter, dated June 12, 2002 and received by the circuit court on September 30, 2002, summarizing his version of the events leading up to his guilty plea as follows:

On or about the date of September 1991, I, Robert C. D'Ambrosio, was charged with second-degree murder. On September 19, 1991, on advice from counsel, James M. Pallett, I pleaded not guilty under diminished capacity.

The complaint I have with the court and Pallett began after my first trial, which ended March 13, 1994 in a mistrial based on the jury's inability to reach a verdict after approximately five days of deliberation.

A new trial date was set September 12, 1994, but for some reason unknown to me I did not appear in court again until February 13, 1995.

At my plea hearing, I was informed on that morning that we would be starting trial on the following Monday. But when

---

**10.** Because the record of the proceedings before the HPA is not before us, we are unable to

confirm D'Ambrosio's contention.

we got into the courtroom things got very confusing for me and happened all too fast. The Judge (Milks) got upset with the prosecutor over his motion to continue the trial to a later date. His reason was that he had a trial set in another court for Monday. Milks told the prosecutor to either be in two places at once or make a deal with one of the defendants.

My trial got changed to a Plea Agreement Hearing. The prosecutor, new to the case, needed to check with his office about past plea agreement Feb. 2, 1994 ([Change of plea (COP)] to manslaughter and agree to a five year minimum term).

I was returned to the holding cells, Pallett came to let me know what had just happened. He stated that we might be able to make a deal for a [COP] to manslaughter. At this, I let him know I would accept that plea, but if they did not give me that deal, I wanted to go to trial! We had one trial already and almost won, I felt my chances were good at winning the next trial.

Pallett left and came back later that afternoon to talk over the deal. He stated that the prosecutor had turned down the deal to [COP] to manslaughter and if we went to trial he would seek a 30–year minimum on a conviction of murder in the second, instead of the 20–year to life that the murder conviction carries. I got mad at the threat and advised Pallett that I wanted to go to trial.

Pallett wanted to keep trying to make some kind of a deal with the prosecutor. I asked him if I plead guilty to the murder charge could he get me the manslaughter time, a 10–year sentence.

He left and came back informing me that the prosecutor would agree that if I plead guilty to murder II, the prosecutor would make a recommendation to the Hawaii Paroling Authority for a 10 year minimum ("The manslaughter sentence"). At this point I felt Pallett should have warned me about the life sentence. But instead he

reminded me that if we went to trial the prosecutor would seek a 30–year minimum.

I asked Pallett if he would be at my minimum to let the parole authority know about the deal we made. He advised me that he would represent me at my minimum and that we had a good case for the 10–year minimum.

This was the turning point for me. The only reason I agreed to the deal was that Pallett would be at my minimum to get me the 10–year sentence. I believed that is what would happen.

I plead guilty to murder in the second degree on Feb. 13, 1995. My sentencing was set for May 11, 1995 before Judge Milks.

At my sentencing, the court noted it is not imposing a mandatory minimum term but that the state and defendant have agreed to stipulate to a 10–year minimum. The court deferred to the paroling authority re: setting of minimum term.

This was to be the last time that I would see or speak to my counsel Mr. Pallett. If I had only known this ahead of time I would not have taken the deal I had.

On May 11, 1995, I was committed to the custody of the Dept. of Public Safety for imprisonment for life with the possibility of parole.

At my minimum hearing, Pallett was sent four (4) Notice of Hearing from the [HPA] (1) Aug. 8, 1995(2) Sept. 7, 1995(3) Nov. 6, 1995(4)? for the setting of my minimum. Four times he did not show. I called him from prison; I also had my family call and try to track him down, all with no luck.

At the fourth hearing, the [HPA] waived my rights to counsel and went ahead and set my minimum at 20 year [ (sic) ] to life. The prosecutor was not at the hearing either, no one let the [HPA] know about my deal.[ 11]

11. Because the record of the proceedings before the HPA is not included in the record on appeal, we are unable to confirm D'Ambrosio's statement that the prosecutor was not at the hearing. However, the record on appeal includes a letter to the HPA, dated May 24, 1995, from deputy prosecuting attorney Bradley R. Pulice, recommending that D'Ambrosio receive a Level I minimum setting and a ten-year "minimum term of incarceration before [D'Ambrosio] is eligible for parole[,]" "per a plea agreement[.]"

I have now found out through research of my own, that the [HPA] would have had to use their guidelines for establishing my minimum. Something Pallett should have advised me on, for I am a level III inmate.

The only way to override this is with the assistance of counsel. (Additional criteria) [HPA] guidelines.

(Footnote added.)

D'Ambrosio also submitted: (1) affidavits from his mother, Carol Ann Shea (Shea), and his sister, Samantha D'Ambrosio (Samantha), attesting to their efforts to get Pallett to appear at D'Ambrosio's hearings before the HPA; (2) a copy of the HPA Guidelines; and (3) a copy of a letter that D'Ambrosio sent to Pallett on June 9, 2002, requesting an explanation of why Pallett had not appeared at the HPA hearings and soliciting Pallett's assistance in determining what had occurred before the HPA.

The affidavit from Shea states, in relevant part, as follows:

In the month of August of 1995, [D'Ambrosio] phoned me and told me that he was upset that his attorney did not show-up [ (sic) ] at his minimum hearing and asked if I would call Mr. Pallett to find out what happened. He also informed me that his calls to Mr. Pallett were not being returned.

I called Mr. Pallett more than ten times and left messages each time on his recorder requesting that he go to Robert's minimum hearing. I continued to call Mr. Pallett, when he did finally answer his phone, I asked him to please go to Robert's minimum hearing because they had postponed it twice since he did not show up. His response to me was, "He wasn't paid to go to the hearing and if I wanted to pay him to go to the hearing he would go." I told him that I did not have any money to pay him and that I thought that the state had paid him to represent Robert. He [ (sic) ] reply was, "I didn't kill anybody, your son did." I cried and said, "Thank you very much" and hung-up [ (sic) ].

The affidavit from Samantha includes the following statement:

In August of 1995, Robert called me several times requesting that I contact Mr. Pallett because he failed to show-up [ (sic) ] at his minimum hearings. I called and left messages on Mr. Pallett's answering machine but my calls were not returned. By accident, one day I bumped into Mr. Pallett on Bishop Street and asked him why he didn't go to Robert's minimum hearing. His reply to me was, "The parole board does not like me and he will do better if I am not there."

On October 28, 2002, the State filed an answer to D'Ambrosio's Rule 40 petition, urging the circuit court to summarily deny the petition on grounds that the allegations in the petition were patently frivolous and without a trace of support.

On May 13, 2003, D'Ambrosio filed an amended petition to vacate, set aside, or correct judgment or to release him from custody (amended Rule 40 petition), stating two grounds for relief:

A. Ground one: Conviction obtained by plea of guilty which was unlawfully induced and not made voluntarily.

.... [D'Ambrosio] only entered guilty plea because counsel promised to represent him at the HPA hearing to assure him that he would only receive a ten year minimum term of imprisonment as supported by plea agreement. Counsel did not show up at any of the scheduled HPA hearings. See declarations and Exhibits B, C, D, E and other documents attached hereto.

B. Ground two: Counsel rendered ineffective assistance of counsel to [D'Ambrosio] by failing to file appeal as desired by [D'Ambrosio].

.... [D'Ambrosio's] desire for counsel to file a notice of appeal and appeal was not done resulting in [D'Ambrosio] being denied an appeal. [D'Ambrosio] and his family members called counsel on numerous occasions. Counsel did not return calls. See declarations and other supporting documents attached hereto.

(Formatting revised.)

In a memorandum in support of his amended Rule 40 petition, D'Ambrosio

claimed that he would not have pleaded guilty if he had been advised that under the HPA Guidelines, he would be classified as a Level III offender and subject to a minimum term of imprisonment of twenty to fifty years. D'Ambrosio also argued that an HPA hearing for setting a minimum prison term is a critical stage of a criminal proceeding and Pallett's failure to represent him at the hearing constituted "gross misadvise" (sic) that "amounted to ineffective assistance of counsel." Finally, D'Ambrosio argued that Pallett rendered ineffective assistance of counsel by failing to file an appeal, presumably from the HPA's order setting D'Ambrosio's minimum term of imprisonment, as desired by D'Ambrosio.

On June 12, 2003, the State filed an answer to D'Ambrosio's amended Rule 40 petition, again urging the circuit court to summarily deny the petition.

On June 13, 2003, the circuit court, without holding a hearing, filed its findings of fact, conclusions of law, and order dismissing D'Ambrosio's petition for post-conviction relief, from which D'Ambrosio appealed on July 10, 2003. The circuit court's findings of fact state, in relevant part, as follows:

### FINDINGS OF FACT

. . . .

4. On February 13, 1995, Petitioner pleaded guilty as charged to the offense of Murder in the Second Degree before the Honorable Marie N. Milks.

5. Prior to the change of plea hearing, Petitioner signed and dated a change of plea form acknowledging that he had gone over the form with his attorney. See Exhibit "A".

5.[ (sic) ] At the start of the change of plea hearing, this court informed Petitioner that it would be asking him questions about the change of plea form to make sure Petitioner understood what was happening and to clarify any misunderstandings he may have had. See Exhibit "B" at page 3 lines 17–21.

6. This court further explained to Petitioner that it wanted to "make sure that no one [was] putting pressure on [him] or forcing [him] in any way to plead." See Exhibit "B" at page 3 lines 21–22.

. . . .

8. During the colloquy, this court asked Petitioner whether he understood that by pleading guilty, he was going to agree that a sufficient basis for a judge to find the elements of Murder in the Second Degree existed. Petitioner responded by answering "yes". See Exhibit "B" at page 5 lines 1–6.

9. In addition, this court asked Petitioner whether he discussed all the evidence in the case with his attorney, and after receiving advice from his attorney, whether he believed he was guilty. Petitioner responded by answering "yes".

. . . .

11. In explaining Petitioner's minimum term, Petitioner stated to the court that "[i]t was up to the paroling authority to set [his] minimum" term. See Exhibit "B" at page 7 lines 4–5.

12. Further, this court explained to Petitioner that as part of the plea agreement with the State, Petitioner was to plead as charged and the State would recommend to the paroling authority that Petitioner "serve ten years before" being eligible for parole. Petitioner responded that he understood. See Exhibit "B" at page 7 lines 6–12.

13. In informing Petitioner that the State's recommendation was not binding on the paroling authority, the court and Petitioner engaged in the following colloquy:

. . . . [ 12]

14. In further explaining Petitioner's minimum term of sentencing, the court stated the following:

THE COURT: Once you plead today, if I make a finding that your plea was entered intelligently, knowingly, and voluntarily, you cannot hereafter wait for

---

12. At this point, the circuit court quoted extensively the colloquy between the circuit court and D'Ambrosio at D'Ambrosio's change of plea hearing. Since the colloquy is quoted earlier in this opinion, it is not repeated here.

the paroling authority to set the minimum and then come back and say I don't like the minimum sentence, I want to withdraw my plea.

MR. D'AMBROSIO: I understand that, your Honor.

THE COURT: And for that reason, we want you to really understand what's going on. So far, do you have any other questions you'd like to direct to me?

MR. D'AMBROSIO: No, I don't.

*See* Exhibit "B" at page 9 lines 11–18.

15. Finally, this court asked Petitioner if any person made any kind of promise to him other than the Rule 11 agreement with the State or whether "anyone made any kind of secret deal or promise to [him]". Petitioner responded in the negative. *See* Exhibit "B" at page 10 lines 20–25.

16. After engaging in its extensive colloquy with Petitioner, this court found that Petitioner's plea was entered intelligently, knowingly, and voluntarily and found him guilty of the offense of Murder in the Second Degree.

(Footnote added.)

The circuit court's conclusions of law state, in relevant part:

### CONCLUSIONS OF LAW

1. Petitioner raises as his first ground for relief that the conviction in Cr. No. 91–2417 was obtained by a plea of guilty which was unlawfully induced and not made voluntarily. Petitioner argues that he only entered into the plea agreement on the false promise that his attorney would represent him at the minimum hearing. *See* Petition (S.P.P. No. 02–1–0059) filed August 21, 2002.

2. As a general rule, where a Petitioner claims that he or she did not voluntarily enter a guilty plea, the court is required to look at the entire record in order to determine whether the claims or recantation are credible and worthy of belief. *Eli v. State,* 63 Haw. 474, 477[, 630 P.2d 113, 116] (1981).

. . . .

4. The record here establishes that at the time Petitioner entered his guilty plea, a plea agreement between Petitioner and the State existed. Pursuant to the plea agreement, Petitioner agreed to plead guilty as charged to the offense of Murder in the Second Degree. In return, the State agreed to recommend a minimum term of imprisonment of ten years to the paroling authority.

5. The record further establishes that this court was particularly careful in its examination of Petitioner to ensure that Petitioner was entering his plea voluntarily, intelligently, and knowingly.

6. In *Eli,* the Hawai'i Supreme Court adopted the standard used by the United States Supreme Court in *Brady v. United States,* 397 U.S. 742[, 90 S.Ct. 1463, 25 L.Ed.2d 747] (1970) to determine the voluntariness of guilty pleas:

[A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (*e.g.* bribes).

*Eli,* 63 Haw. at 478–79[, 630 P.2d 113] *quoting Brady* at 755[, 90 S.Ct. 1463].

7. In this case, the record clearly shows that there was a factual basis for the court to accept Petitioner's guilty plea. Petitioner even acknowledged that there was sufficient evidence for a judge to find him guilty of Murder in the Second Degree, was aware of the consequences of pleading guilty, and understood the agreement between himself and the State.

8. This court fully explained to Petitioner that the State's recommendation to the paroling authority was not binding in that it was ultimately the decision of the paroling authority to set the minimum term of imprisonment. In fact, this court explained to Petitioner that the paroling authority could set a lower minimum, and

458

that the paroling authority could as well set a higher minimum than what the State was recommending.

9. Further, this court informed Petitioner that once it made the finding that his plea was entered intelligently, knowingly, and voluntarily, he could not return to court to withdraw his plea because he did not like the minimum term set by the paroling authority.

10. Finally, the record clearly establishes that this court carefully questioned Petitioner to ensure that no person was putting pressure on him or forcing him to plea; that his attorney was not putting pressure on him or forcing him to plea; and that no person made any kind of secret deal or promise to him to plead guilty.

11. In short, the fact that Petitioner received a minimum term for a longer period of time than expected, does not render the guilty plea involuntary. *Eli* at 479[, 630 P.2d 113] *(citation omitted).*

12. Therefore, based on the extensive record of the circumstances surrounding Petitioner's change of plea, including the transcribed hearings provided by the State, this court holds that Petitioner's plea of guilty to the offense of Murder in the Second Degree was entered into voluntarily.

13. Thus, Petitioner's Ground One is summarily denied as it is frivolous and without a trace of support from the record. *HRPP Rule 40(f).*

14. Petitioner raises as his second ground for relief that he was denied effective assistance of counsel. Petitioner supports this contention by stating that counsel (James Pallet [ (sic) ], Esq.) "failed to show at my minimum hearing four (4) times [and that] counsel failed to advise me of the [HPA Guidelines,] which made my plea deal valueless." *See* Petition (S.P.P. No. 02–1–0059) filed August 21, 2002.

15. As a general rule, a hearing on a Rule 40 Petition for post-conviction relief should be held when the Petition states a colorable claim. *Dan v. State,* 76 Hawai'i 423, 427[, 879 P.2d 528] (1994).

16. To establish a colorable claim, the allegations of the petition must show that if taken as true, the facts alleged would change the verdict, however, a petitioner's conclusions need not be regarded as true. Where examination of the record of the trial courts [ (sic) ] proceedings indicates that the petitioner's allegations show no colorable claim, it is not error to deny the petition without a hearing. *Id. (internal citations and quotation marks omitted).*

17. Here, even if counsel did appear at Petitioner's minimum hearing, and advised Petitioner of the HPA guidelines for establishing minimum terms, nothing in the record exists to support the contention that the result of the parole hearing would have been any different.

18. What the record in this case *does* show however, is that Petitioner had been fully advised by this court that the State's recommendation of a minimum term of ten (10) years to the paroling authority would not be binding, *and that it was totally up to the paroling authority to establish Petitioner's minimum term. See* Exhibit "B" at pages 7–8.

19. In addition, this court asked Petitioner if any person made any kind of promise to him other than the Rule 11 agreement with the State or whether "anyone made any kind of secret deal or promise to [him]" whereby Petitioner responded in the negative. *See* Exhibit "B" at page 10 lines 20–25.

20. Thus, Petitioner's plea deal was not "valueless" as the record clearly shows that the change of plea was based on Petitioner's own free will, that Petitioner understood the State's recommendation was not binding on the paroling authority, and the paroling authority would ultimately determine Petitioner's minimum term.

21. Again, the fact that Petitioner received a minimum term for a longer period of time than expected, does not render the guilty plea involuntary, does not render his plea deal "valueless", nor does it support his contention that he was denied effective assistance of counsel.

22. Therefore, Petitioner's Ground Two is summarily denied as it is frivolous and

without a trace of support from the record. *HRPP Rule 40(f)*.

On July 15, 2003, after D'Ambrosio had filed his appeal from the June 13, 2003 order dismissing his Rule 40 petition, the circuit court entered amended findings of fact, conclusions of law, and order dismissing D'Ambrosio's petition for post-conviction relief (the amended order). The amended order included findings of fact and conclusions of law identical to those contained in the June 13, 2003 order. It also included additional findings of fact that addressed Ground two [13] of D'Ambrosio's amended Rule 40 petition and concluded that D'Ambrosio was not denied effective assistance of counsel on appeal. D'Ambrosio did not file a notice of appeal from the amended order.

## STANDARD OF REVIEW

■ The general rule is that

a hearing should be held on a Rule 40 petition for post-conviction relief where the petition states a colorable claim. *To establish a colorable claim, the allegations of the petition must show that if taken as true the facts alleged would change the verdict*[;] however, a petitioner's conclusions need not be regarded as true. Where examination of the record of the trial court proceedings indicates that the petitioner's allegations show no colorable claim, it is not error to deny the petition without a hearing. ·

*State v. Allen*, 7 Haw.App. 89, 92, 744 P.2d 789, 792 (1987) 69 Haw. 678 (1987) (emphasis added), overruled on other grounds; *Dan v. State*, 76 Hawai'i 423, 879 P.2d 528 (1994).

■ Whether an HRPP Rule 40 petition has made a showing of a colorable claim so as to require a hearing before the lower court is a question of law. *Id.* at 427, 879 P.2d at 532. Therefore, a lower court's summary denial of an HRPP Rule 40 petition without a hearing based on no showing of a colorable claim is reviewed on appeal *de novo*, and the right/wrong standard of review applies. *Id.*

13. The circuit court found it unnecessary to address Ground one of D'Ambrosio's amended Rule 40 petition to vacate, set aside, or correct judgment or to release him from custody "[s]ince . . .

## DISCUSSION

A. *Whether a Colorable Claim Was Presented that D'Ambrosio's Conviction Was Obtained by An Unconstitutional Failure of the Prosecution to Disclose "Evidence Favorable to Him"*

■ D'Ambrosio alleged in his Rule 40 petition that his conviction was obtained by an unconstitutional failure of the prosecution to disclose evidence favorable to him. Specifically, D'Ambrosio contends that the prosecution should have informed him that based on his past criminal history and the nature of his offense, he would be classified as a Level III offender under the HPA Guidelines and subject to a minimum term of imprisonment of twenty to fifty years.

We are unaware of any legal duty on the part of the prosecution to disclose to a defendant all the potential consequences of the HPA Guidelines. Accordingly, this ground of D'Ambrosio's Rule 40 petition is patently frivolous and raised no colorable claim warranting an evidentiary hearing.

B. *Whether a Colorable Claim Was Established that D'Ambrosio's Guilty Plea Was Unlawfully Induced and Not Made Voluntarily*

■ In his Rule 40 petition, D'Ambrosio claimed that his conviction was obtained by a "plea of guilty which was unlawfully induced and not made voluntarily" because he "only entered into this plea agreement on the false promis[e] that [his] counsel would represent [him] at [his] minimum[-imprisonment-term hearing before the HPA]."

The record indicates, however, that the circuit court engaged in the following colloquy with D'Ambrosio at D'Ambrosio's COP hearing:

> THE COURT: Has anyone made any kind of promise to you other than the Rule 11 agreement which was basically that the court would recognize the terms of the

Ground One in both the original and amended Petitions raise identical issues, and since this court has already ruled on Ground One of Petitioner's Rule 40 Petition[.]"

agreement? Has anyone made any kind of secret deal or promise to you?

MR. D'AMBROSIO: No, they didn't.

The foregoing colloquy provides evidence that D'Ambrosio's guilty plea was not based on an improper promise by Pallett. Additionally, the record indicates that D'Ambrosio did get the essence of what he bargained for: the opportunity to receive a lower minimum imprisonment term. Finally, the record indicates that the circuit court specifically and extensively advised D'Ambrosio that the HPA could impose a longer minimum term, and D'Ambrosio stated on the record that he understood this possibility. Under the circumstances, we conclude that no colorable claim was established that D'Ambrosio entered his guilty plea involuntarily.

We note, moreover, that as a result of this opinion, D'Ambrosio is being granted the very relief he claims he was entitled to and based his guilty plea on; namely, the representation of counsel at his minimum-term hearing, unless it is established that D'Ambrosio waived this right.

C. *Whether a Colorable Claim Was Established that D'Ambrosio Received Ineffective Assistance of Counsel During Plea Negotiations*

According to D'Ambrosio, he received ineffective assistance of counsel during plea negotiations because he was not informed by counsel that under existing HPA Guidelines, he would be classified as a Level III inmate and subject to a twenty- to fifty-year minimum term of imprisonment, thereby rendering the prosecutor's agreement to recommend a ten-year minimum term "valueless."

In *Eli v. State*, 63 Haw. 474, 630 P.2d 113 (1981), which involved an appeal from the denial of an HRPP Rule 40 petition for post-conviction relief, the Hawai'i Supreme Court adopted the following standard for determining the voluntariness of guilty pleas, set forth by the United States Supreme Court in *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970):

[A] plea of guilty entered by one fully aware of the *direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel,* must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (*e.g.* bribes).

*Eli*, 63 Haw. at 478–79, 630 P.2d at 116–17 (emphasis added).

Since then, the Hawai'i Supreme Court has made clear that prior to accepting a guilty or *nolo contendere* plea, a trial court must inform a defendant of the direct, but not the collateral, consequences of the plea. *State v. Nguyen*, 81 Hawai'i 279, 287, 916 P.2d 689, 697 (1996) (holding that "[c]ourts need not inform defendants prior to accepting their guilty or nolo contendere pleas about every conceivable collateral effect that a conviction might have. . . . Accordingly, it is the general rule that, absent a rule or statute, a court has no duty to warn defendants pleading guilty or 'no contest' about the possibility of deportation as a collateral consequence of conviction"). In *Nguyen*, the supreme court explained that

[m]anifestly, a criminal court is in no position to advise on all the ramifications of a guilty plea personal to a defendant. Accordingly, the courts have drawn a distinction between consequences of which the defendant must be advised, those which are "direct", and those of which the defendant need not be advised, "collateral consequences." A direct consequence is one which has a definite, immediate and largely automatic effect on defendant's punishment. Illustrations of collateral consequences are loss of the right to vote or travel abroad, loss of civil service employment, loss of a driver's license, loss of the right to possess firearms or an undesirable discharge from the Armed Services. The failure to warn of such collateral consequences will not warrant vacating a plea because they are peculiar to the individual and generally result from the actions taken by agencies the court does not control.

*Id.* at 288, 916 P.2d at 698 (quoting *People v. Ford*, 86 N.Y.2d 397, 633 N.Y.S.2d 270, 273–

74, 657 N.E.2d 265, 267–68 (N.Y.1995) (citations omitted)).

Subsequently, in *Foo v. State*, 106 Hawaiʻi 102, 102 P.3d 346 (2004), the supreme court held that a trial court accepting a guilty plea was not required to inform the defendant that upon conviction, the defendant was required by statute to register as a sex offender. The supreme court explained:

HRPP Rule 11(c) requires that a "court shall not accept a plea of guilty without first" determining that the defendant understands, *inter alia*, "the maximum *penalty* provided by law, *and the maximum sentence.*" (Emphasis added.) Accordingly, although sex offender registration is triggered upon one's conviction, it does not have a definite, immediate and largely automatic effect on a defendant's *punishment.* Instead, the registration requirements of HRS chapter 846E are similar to the restrictions on the right to travel or the loss of a driver's license that are collateral consequences of a guilty plea.

Moreover, sex offender registration requirements generally involve actions taken by agencies the court does not control. Pursuant to HRS § 846E–3(a), the attorney general and county police departments, both agencies not controlled by the judiciary, are required to administer the registration of convicted persons and the release of information to other law enforcement and government agencies and to the public.

In this regard, sex offender registration requirements are "collateral" consequences of Defendant's conviction, and, thus, the court had no duty to warn Defendant, prior to pleading guilty, about the collateral consequences of conviction flowing from sex offender registration requirements.

*Id.* at 113–14, 102 P.3d at 357–58 (citations, brackets, ellipsis, and internal quotation marks omitted).

█ It is well-established in Hawaiʻi, therefore, that prior to accepting a guilty or *nolo contendere* plea, a trial court is required to inform a defendant of the direct, but not the collateral, consequences of the defendant's conviction.

█ In this case, D'Ambrosio has not alleged that he should be allowed to withdraw his guilty plea because the *circuit court* failed to inform him of the collateral consequences of the HPA Guidelines on the setting of his mandatory minimum prison term. Instead, D'Ambrosio alleged that he should be allowed to withdraw his guilty plea because his *counsel* was ineffective for failing to explain the collateral consequences of the HPA Guidelines to him. The troublesome question before us, therefore, is whether a criminal defense counsel has a constitutional duty to advise a client of the collateral consequences of a guilty plea.

The rule adopted by the overwhelming majority of courts from other jurisdictions is that the *failure* of defense counsel to advise a client of the collateral consequences of a guilty plea does not constitute ineffective assistance of counsel. *See, e.g., United States v. Gonzalez*, 202 F.3d 20, 25 (1st Cir. 2000) ("[c]ounsel's failure to advise a defendant of a collateral consequence is a legally insufficient ground for a plea withdrawal"); *United States v. Santelises*, 509 F.2d 703, 704 (2d Cir.1975) (failure of counsel to inform defendant that defendant might be subject to deportation upon conviction has no legal significance to defendant's claim of ineffective assistance of counsel, since defendant does not aver that counsel made an affirmative misrepresentation); *Meyers v. Gillis*, 93 F.3d 1147, 1153 (3d Cir.1996) ("[i]t is well settled that the Constitution does not require" defense counsel or the court to provide a defendant with information concerning parole eligibility); *United States v. DeFreitas*, 865 F.2d 80, 82 (4th Cir.1989) ("[w]e cannot say that counsel performed unreasonably in merely neglecting to inform [defendant] that he might be subject to deportation or denied re-entry into the United States because of his guilty plea"); *United States v. Banda*, 1 F.3d 354, 356 (5th Cir. 1993) (failure to advise a defendant of a collateral consequence of the criminal process "does not amount to ineffective assistance of counsel"); *Santos v. Kolb*, 880 F.2d 941, 944 (7th Cir.1989) (declining "to hold as a matter of law, that counsel's failure to inform a client as to immigration consequences which may result from a guilty

plea, without more, is 'outside the wide range of professionally competent assistance' "); *Varela v. Kaiser,* 976 F.2d 1357, 1358 (10th Cir.1992) ("deportation is a collateral consequence of the criminal proceeding and therefore the failure to advise does not amount to ineffective assistance of counsel"); *United States v. Campbell,* 778 F.2d 764, 768 (11th Cir.1985) ("counsel's failure to advise the defendant of the collateral consequences of a guilty plea cannot rise to the level of constitutionally ineffective assistance"); *United States v. Del Rosario,* 902 F.2d 55, 59 (D.C.Cir.1990) (adopting as the proper rule the view that a "counsel's failure to advise the defendant of the collateral consequences of a guilty plea cannot rise to the level of constitutionally ineffective assistance"); *Tafoya v. State,* 500 P.2d 247, 252 (Alaska 1972) ("failure of counsel to inform of the possibility of deportation does not constitute denial of the right to the effective assistance of counsel"); *State v. Rosas,* 183 Ariz. 421, 904 P.2d 1245, 1247 (Ariz.Ct.App. 1995) ("declin[ing] to impose upon defense counsel a duty to inform non-citizen defendants about potential collateral deportation proceedings that may result from entering a guilty plea[,]" and holding that "failure of counsel to provide such information to defendants does not constitute ineffective assistance of counsel"); *Ray v. State,* 133 Idaho 96, 982 P.2d 931, 937 (1999) ("[t]he Sixth Amendment contains no implied duty for an attorney to inform his client of collateral consequences of a guilty plea"); *People v. Davidovich,* 463 Mich. 446, 618 N.W.2d 579, 582 (2000) ("immigration consequences of a plea are collateral matters that do not bear on whether the defendant's plea was knowing and voluntary. For the same reason, a failure by counsel to give immigration advice does not render the lawyer's representation constitutionally ineffective"); *Barajas v. State,* 115 Nev. 440, 991 P.2d 474, 476 (1999) (failure of trial counsel to advise a defendant of possible immigration consequences of a guilty plea "does not fall below an objective standard of reasonableness and, thus, does not rise to the level of ineffective assistance of counsel"); *State v. Elliott,* 133 N.H. 190, 574 A.2d 1378, 1381 (1990) ("defense counsel's failure to advise of collateral consequences, as under the habitual offender law, is no ground for withdrawing a plea as unintelligent and involuntary"); and *State v. Martinez–Lazo,* 100 Wash.App. 869, 999 P.2d 1275, 1279 (2000) (trial counsel has the obligation to aid a defendant in evaluating the evidence against him and in discussing the possible direct, but not collateral consequences, of a guilty plea).

However, courts are divided on whether erroneous advice or misinformation by a defense counsel can constitute ineffective assistance of counsel. For example, the United States Court of Appeals for the Second Circuit has held that erroneous advice, "without a clear showing of unprofessional conduct, is not enough [to set aside a conviction]." *United States v. Parrino,* 212 F.2d 919 (2d Cir.1954).

Other courts, on the other hand, have concluded that defense counsel's erroneous advice *can* amount to ineffective assistance of counsel, warranting the withdrawal of a guilty plea. *See, e.g., Cepulonis v. Ponte,* 699 F.2d 573, 577 (1st Cir.1983) (although defendant need not be informed of the details of his parole eligibility, "misinformation may be more vulnerable to constitutional challenge than mere lack of information"); *Strader v. Garrison,* 611 F.2d 61, 65 (4th Cir.1979) ("though parole eligibility dates are collateral consequences of the entry of a guilty plea of which a defendant need not be informed if he [or she] does not inquire, when he [or she] is grossly misinformed about it by his [or her] lawyer, and relies upon that misinformation, he [or she] is deprived of his [or her] constitutional right to counsel"); *Sparks v. Sowders,* 852 F.2d 882, 885 (6th Cir.1988) ("[w]e now hold that gross misadvice concerning parole eligibility can amount to ineffective assistance of counsel"); *State v. Elliott,* 574 A.2d at 1381 (recognizing "at least the possibility that deficiencies in advice about collateral consequences of a plea may pull a lawyer's representation below the level of 'reasonable competence' by which effective assistance of counsel is constitutionally measured").

In this case, D'Ambrosio did not complain that he was misinformed or misadvised by

Pallett about the HPA Guidelines. Ground two of his Rule 40 petition states: "Counsel failed to advise me of the [HPA] Guidelines for establishing minimum terms which made my plea deal valueless."

In light of the overwhelming case law in other jurisdictions, we conclude that no colorable claim was established that Pallett's alleged failure to inform D'Ambrosio about the HPA Guidelines constituted ineffective assistance of counsel.

D. *Whether a Colorable Claim Was Presented that D'Ambrosio Was Denied Effective Assistance of Counsel at His Minimum–Term Hearing*

1.

■ Pursuant to the right to counsel set forth in the Sixth Amendment of the United States Constitution,[14] as applied to the states through the Due Process Clause of the Fourteenth Amendment,[15]

appointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be effected. In particular, *Townsend v. Burke*, [334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)] illustrates the critical nature of sentencing in a criminal case and might well be considered to support by itself a holding that the right to counsel applies at sentencing.

*Mempa v. Rhay*, 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). In *Townsend*, the Supreme Court reversed the conviction of a defendant who had pleaded guilty, holding that the absence of counsel during the defendant's sentencing, coupled with "materially untrue" assumptions made by the sentencing judge concerning the defendant's criminal record, was "inconsistent with due process of law." 334 U.S. at 740–41, 68 S.Ct. 1252. The Supreme Court explained that

counsel might not have changed the sentence, but he could have taken steps to see that the conviction and sentence were not predicated on misinformation or misreading of court records, a requirement of fair play which absence of counsel withheld from this prisoner.

*Id.* at 741, 68 S.Ct. 1252.

Subsequently, in *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the United States Supreme Court held that a petitioner was denied due process of law when he was sentenced to death based in part on confidential information in a presentence report that was not disclosed to the petitioner or his counsel. The Supreme Court initially observed:

[I]t is now clear that the *sentencing process,* as well as the trial itself, must satisfy the requirements of the Due Process Clause. Even though the defendant has no substantive right to a particular sentence within the range authorized by statute, *the sentencing is a critical stage of the criminal proceeding at which he is entitled to the effective assistance of counsel.* The defendant has a legitimate interest in the *character of the procedure which leads to the imposition of sentence* even if he may have no right to object to a particular result of the sentencing process.

*Id.* at 358, 97 S.Ct. 1197 (emphases added, citations omitted). The Supreme Court rejected the prosecution's argument that "trial judges can be trusted to exercise their discretion in a responsible manner, even though they may base their decisions on secret information[,]" holding:

[T]he argument rests on the erroneous premise that the participation of counsel is superfluous to the process of evaluating the relevance and significance of aggravating and mitigating facts. Our belief that debate between adversaries is often essential to the truth-seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to

---

**14.** The Sixth Amendment to the United States Constitution provides, in relevant part, "In all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his [or her] defence." U.S. CONST amend. VI.

**15.** The Fourteenth Amendment to the United States Constitution provides, in pertinent part, "[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV, § 1.

comment on facts which may influence the sentencing decision in capital cases. *Id.* at 360, 97 S.Ct. 1197.

In *United States v. Salemo*, 61 F.3d 214 (3d Cir.1995), the Third Circuit Court of Appeals vacated a defendant's sentence, concluding that the defendant had been denied his constitutional right to counsel when he was allowed to proceed *pro se* at his sentencing hearing without the district court conducting a thorough inquiry to ensure that the defendant's waiver of counsel at his sentencing was voluntary, knowing, and intelligent. The court explained that "sentencing is a critical and oftentimes complicated part of the criminal process that contains subtleties which may be beyond the appreciation of the average layperson seeking to represent him/herself." *Id.* at 220. For example, the court observed, under the "complex hypertechnical" federal sentencing system, pursuant to which sentencing guidelines are used to determine a defendant's appropriate sentence, a defendant's ultimate fate may be "determined more by the application of the Guidelines than the determination of innocence or guilt." *Id.* "Given these intricacies," the court held,

> it is particularly important that a sentencing court be certain that a defendant understands the perilous path he/she is going down in attempting to proceed to sentencing without the benefit of counsel.
>
> In addition, a defendant who is unfamiliar with the post conviction process may inadvertently waive a meritorious argument that he/she might otherwise have raised on appeal. Thus, at sentencing, just as at trial, "a defendant's waiver of counsel can be deemed effective only where the district court has made a searching inquiry sufficient to satisfy him[/her] that the defendant's waiver was understanding and voluntary."

*Id.* (quoting *United States v. Welty*, 674 F.2d 185, 189 (3d Cir.1982)).

### 2.

In Hawai'i, the legislature has implemented a sentencing system that vests in the HPA significant discretionary power to determine felony imprisonment sentences.

Apart from certain classes of crimes for which the HRS requires the circuit court to impose mandatory minimum terms of imprisonment (*see, e.g.,* HRS §§ 706–660.1 (1993) and 706–660.2 (1993)) or authorizes the circuit court to impose extended or consecutive terms of imprisonment (*see, e.g.,* HRS §§ 706–661 (Supp.2005) and 706–668.5 (1993)), Hawai'i's courts are required to sentence persons convicted of felonies to the maximum specified length of the indeterminate sentence applicable to the offenses for which they are convicted. *See* HRS §§ 706–656(2) (Supp.2005), 706–659 (Supp.2005), and 706–660 (1993). The minimum term of their imprisonment is then determined by the HPA, pursuant to procedures set forth in HRS § 706–669 (1993). *Id.* Under this arrangement, it is the HPA, not the courts, that exercises most of the State's felony sentencing discretion.

At the time D'Ambrosio was sentenced, the relevant part of HRS § 706–656(2) (1993) provided as follows:

> Persons convicted of second degree murder ... shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the [HPA]; provided that persons who are repeat offenders under section 706–606 .5 shall serve at least the applicable mandatory minimum term of imprisonment[.]

Additionally, HRS § 706–669 (1993), which defined the process for determining a convicted felon's minimum term of imprisonment, provided, in relevant part:

> **Procedure for determining minimum term of imprisonment.** (1) When a person has been sentenced to an indeterminate or an extended term of imprisonment, the [HPA] shall, as soon as practicable but no later than six months after commitment to the custody of the director of the department of [public safety] hold a hearing, and on the basis of the hearing make an order fixing the minimum term of imprisonment to be served before the prisoner shall become eligible for parole.

The fact that the HPA determines the minimum prison term that a convicted person

must serve undoubtedly affects that person's "substantial rights." *Mempa v. Rhay,* 389 U.S. at 134, 88 S.Ct. 254. Moreover, the HPA Guidelines set forth rather complex criteria [16] for categorizing a convicted person

16. For example, the HPA Guidelines list the following criteria for Level I punishment, which can yield a five- to ten-year minimum term if the defendant was sentenced by the court to life imprisonment with the possibility of parole:

1. **Nature of Offense:** The offense was against the person and/or property, and the offender displayed a disregard for the safety and welfare of others.

2. **Degree of Injury/Loss to Person or Property:** The injury or loss suffered by the victim(s) was less than those experienced by similarly situated victims.

3. **Criminal History:** The person has no more than 1 prior felony conviction since he or she was 18 years old. (If the offender is under 18 years of age at conviction, the above two criteria will receive added weight.)

4. **Character and Attitude of Offender With Respect to Criminal Activity or Lifestyle:** Based on the person's character, attitude, and/or criminal history (both juvenile and adult), continued criminal activity after release from prison seems unlikely.

5. **Efforts Made to Live Pro–Social Life Prior to Commitment to Prison:** Based on the person's life in the community prior to commitment to prison (employment, military service, ability to make and meet commitments, willingness to deal responsibly with personal problems, etc.), it is likely that the person will respond positively to a program of parole supervision and lead a pro-social life upon release.

6. **Probation Revocation:** The offender was placed on probation for the instant offense(s) but due to a technical violation of probation or a new conviction for a misdemeanor or less serious offense the offender's probation was revoked.

7. **Youth Adult Offender:** The person was sentenced as a young adult offender under Section 706–667, HRS.

The criteria for Level III punishment, which will lead to a presumptive twenty- to fifty-year minimum term where a defendant was sentenced by the court to life imprisonment with possibility of parole, are as follows:

1. **Nature of Offense:**
   a. The offense was against a person(s) and the offender displayed a callous and/or cruel disregard for the safety and welfare of others; or
   b. The offense involved the manufacture, importation, distribution, or cultivation of substantial quantities of drugs. Paragraph 4, subparagraph (a) or (b) of this section may be used to substantiate the level of involvement of the person in the offense(s);
   c. The offense was committed against the elderly, a handicapped person, or a minor, and the conviction was for murder, attempted murder, sexual assault, robbery, assault, or kidnapping; and

1. The offender, in the course of committing or attempting to commit one of the above offenses, inflicted bodily injury on a person who was:
   a. 60 years of age or older; or
   b. blind, paraplegic, or quadriplegic; or
   c. 12 years of age or younger; and

2. Such factors as age and physical disabilities are known or reasonably should have been known by the convicted person.

2. **Degree of Injury/Loss to Person or Property:** The injury or loss suffered by the victim(s) was **more** than those experienced by similarly situated victims.

3. **Criminal History:**
   a. The person has been convicted previously of three or more felonies committed at different times when s/he was 18 years of age or older; or
   b. The person has served a prior prison term (one year or longer) for a felony level conviction, and the instant offense is for murder, attempted murder, sexual assault, assault, robbery, or possession of firearm(s).

4. **Character and Attitude of Offender With Respect to Criminal Activity or Lifestyle:** Based on the person's character, attitude, and/or criminal history (both juvenile and adult), future criminal activity remains probable; or
   a. The circumstances of the crime show that the convicted person has knowingly devoted himself or herself to criminal activity as a major or primary source of livelihood; or
   b. The convicted person has substantial income or resources not explained to be derived from a source other than criminal activity; or
   c. The person has been subjected to a psychiatric examination resulting in the conclusion that his or her criminal conduct has been characterized by compulsive, aggressive behavior with heedless indifference to consequences, and that such a condition makes him or her a serious danger to others.

5. **Efforts Made to Live Pro–Social Life Prior to Commitment to Prison:** Based on the person's life in the community prior to commitment to prison (employment, military service, ability to meet commitments, willingness to deal responsibility [(sic)] with personal problems, etc.), it is unlikely that the offender would respond positively to a program of parole supervision and lead a pro-social life upon release.

6. **Involvement of Offender in the Instant Offense(s):** Based on available evidence, the offender's actions prior to or during the instant offense seem to indicate that he or she played a substantial role or was the insti-

and determining a convicted person's level of punishment. The HPA Guidelines themselves mention that the criteria "are, in some instances, a matter of individual interpretation and perception and cannot be completely objective; however, given the complexity of each person's case, certain amounts of subjectivity remain necessary and appropriate."

Accordingly, we hold that the HPA minimum-term hearing is a critical stage of the criminal proceeding and a convicted person is constitutionally entitled to be represented at the hearing by counsel who can ensure that the minimum sentence imposed by the HPA is "not predicated on misinformation or misreading of court records," which is "a requirement of fair play." *Mempa v. Rhay,* 389 U.S. at 133, 88 S.Ct. 254 (quoting *Townsend v. Burke,* 334 U.S. at 741, 68 S.Ct. 1252).

### 3.

The United States Supreme Court has stated that "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.... Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost." *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Moreover, the constitutional right to the assistance of counsel is waivable only when the waiver is "voluntarily and intelligently undertaken." *State v. Merino,* 81 Hawai'i 198, 219, 915 P.2d 672, 693 (1996). Furthermore,

[c]ourts do not presume acquiescence in the loss of fundamental rights and such a presumption in the light of a silent record is not constitutionally permissible.

Whether an accused has effectively waived his [or her] right to counsel depends largely on the facts and circumstances of the particular case. Among the probative factors bearing on the question are the age, education, and mental capacity of the defendant, his [or her] background and experience, and his [or her] conduct at the time of the alleged waiver.

gator or leader in the planning or commis-

*State v. Dicks,* 57 Haw. 46, 48, 549 P.2d 727, 729–30 (1976) (citations omitted).

In his Rule 40 petition, D'Ambrosio alleged that Pallett failed to appear at four scheduled HPA minimum-term hearings and, consequently, the HPA "waived" D'Ambrosio's right to the presence of counsel. Because the record on appeal does not include the record and transcripts of the HPA hearing at which the "waiver" took place, this court is unable to confirm D'Ambrosio's allegations or make an informed ruling on the waiver issue. However, we conclude that a colorable claim was definitely presented that D'Ambrosio was denied the effective assistance of counsel at his HPA minimum-term hearing and did not knowingly and intelligently waive his right to the presence of counsel.

Accordingly, an evidentiary hearing to sort out what happened before the HPA was required and the circuit court erred in summarily denying Ground two of the Rule 40 petition as being "frivolous and without a trace of support from the record."

### 4.

Intermediate Court of Appeals Associate Judge Craig H. Nakamura, in his concurring opinion, believes that this case should be decided based on the "statutory right to counsel at the minimum-term parole hearing" granted by HRS § 706–669(3) (1993). HRS § 706–669, entitled "Procedure for determining minimum term of imprisonment[,]" provides, in relevant part, as follows:

(3) The prisoner shall be given reasonable notice of the hearing under subsection (1) and *shall be permitted to be heard* by the authority on the issue of the minimum term to be served before the prisoner becomes eligible for parole. *In addition, the prisoner shall:*

(a) *Be permitted to consult with any persons the prisoner reasonably desires, including the prisoner's own legal counsel, in preparing for the hearing;*

sion of the offense.

(b) *Be permitted to be represented and assisted by counsel at the hearing;*

(c) *Have counsel appointed to represent and assist the prisoner if the prisoner so requests and cannot afford to retain counsel;* [17] *and*

(d) *Be informed of the prisoner's rights under (a), (b), and (c).*

(Emphases and footnote added.) The commentary on HRS § 706–669(3)(c) explains that "subsection (3) specifically provides that the prisoner will be afforded assistance and representation by counsel, *if the prisoner wishes.*" (Emphasis added.)

Our reading of HRS § 706–669 is that it statutorily permits a prisoner to consult with and be assisted and represented by counsel at the HPA minimum-term hearings. Additionally, if a prisoner cannot afford counsel and requests the appointment of counsel to represent him or her, HRS § 706–669 provides that counsel shall be appointed. However, the onus is on the prisoner to take affirmative steps to request representation by appointment of counsel, and no statutory entitlement exists to have counsel appointed, absent a request by the prisoner.

17. There does not appear to be any statute authorizing the HPA to appoint counsel to represent a prisoner at a minimum-term hearing. However, at the time D'Ambrosio appeared before the HPA for his minimum-term hearing, HRS chapter 802, which sets forth the mechanism for providing counsel to an indigent prisoner, included the following relevant sections:

§ 802–1 **Right to representation by public defender or other appointed counsel.** Any indigent person who is (1) arrested for, charged with or convicted of an offense or offenses punishable by confinement in jail or prison or for which such person may be or is subject to the provisions of chapter 571 ... shall be entitled to be represented by a public defender. If, however, conflicting interests exist, or if the public defender for any other reason is unable to act, or if the interests of justice require, the court may appoint other counsel.
....
The appearance of a public defender in all hearings before the [HPA] ... shall be subject to the approval of the chairperson of the [HPA.]

§ 802–5 **Appointment of counsel; compensation.**
(a) When it shall appear to a judge that a person requesting the appointment of counsel satisfies the requirements of this chapter, *the judge shall appoint counsel to represent the*

## CONCLUSION

In light of the discussion above, we vacate that part of the circuit court's Order that summarily dismissed Ground two of D'Ambrosio's Rule 40 petition and remand this case to the circuit court with instructions that it hold an evidentiary hearing on the allegations raised in Ground two. If, following the evidentiary hearing, the circuit court determines that D'Ambrosio was not represented by counsel at his HPA minimum-term hearing and did not intelligently and voluntarily waive his right to be so represented and to have counsel appointed to represent him if he could not afford one, the circuit court shall vacate the HPA's order setting D'Ambrosio's minimum term and remand this case to the HPA for a new HPA minimum-term hearing at which D'Ambrosio is provided representation.

## Concurring Opinion by NAKAMURA, J.

I concur in the result reached by the majority. I do not join in the majority's opinion, however, because I believe it is unnecessary to reach the question of whether the

*person at all stages of the proceedings* including appeal, if any. If conflicting interests exist, or if the interests of justice require, the court may appoint private counsel, who shall receive reasonable compensation for necessary expenses, including travel, the amount of which shall be determined by the court, and fees pursuant to subsection (b). All such expenses shall be certified by the court. Duly certified claims for payment shall be paid upon vouchers approved by the director of finance and warrants drawn by the comptroller.

(b) The court shall determine the amount of reasonable compensation to appointed counsel, based on the rate of $40 an hour for out-of-court services, and $60 an hour for in-court services and with a maximum fee in accordance with the following schedule:
....
(6) *Any other type of administrative [$]1,500 or judicial proceeding* including cases arising under chapter 571[.]
(Emphases added.) Effective July 1, 2006, HRS § 802–5 was amended to provide that compensation for appointed counsel shall be "based on the rate of $90 an hour" without differentiation between in-court and out-of-court services, and the maximum amount payable to counsel for services provided at an administrative proceeding was changed to $3,000.00. 2006 Haw. Sess. L. Act 133, § 802–5 at 370–71.

Sixth Amendment right to counsel extends to a minimum-term parole hearing. Petitioner–Appellant Robert C. D'Ambrosio (D'Ambrosio) challenges the validity of his minimum-term parole hearing because his counsel failed to appear. Hawaii Revised Statutes (HRS) § 706–669(3) (1993) grants a prisoner a statutory right to counsel at the minimum-term parole hearing. In my view, the majority should have decided D'Ambrosio's claim based on his statutory right to counsel without addressing whether he had a right to counsel under the Sixth Amendment.

It is well settled that important questions regarding the interpretation of constitutional provisions should ordinarily be decided only when necessary to the resolution of a case. *State v. Poaipuni,* 98 Hawai'i 387, 401, 49 P.3d 353, 367 (2002) (Moon, C.J., concurring). "We should be reluctant to address constitutional questions when it is not necessary to do so." *Id.* at 402, 49 P.3d at 368. "[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, this court will decide only the latter." *State v. Lo,* 66 Haw. 653, 657, 675 P.2d 754, 757 (1983) (quoting *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)) (internal quotation marks, ellipses points, and brackets omitted).

Assuming that D'Ambrosio's allegation concerning the non-appearance of his counsel at the minimum-term hearing is true, D'Ambrosio either was denied his statutory right to counsel under HRS § 706–669(3) or waived his right to counsel. In either case, D'Ambrosio's statutory right to counsel, which the State of Hawai'i (the State) does not dispute, provides a sufficient basis for resolving his appeal. If D'Ambrosio was denied his statutory right to counsel, he is entitled to a new minimum-term hearing at which he shall "[b]e permitted to be represented and assisted by counsel[.]" HRS § 706–669(3)(b). If D'Ambrosio waived his right to counsel, he has no cause to complain. Accordingly, I would decline to reach the question of whether D'Ambrosio had a right to counsel at the minimum-term parole hearing under the Sixth Amendment.

My reluctance to reach the Sixth Amendment question finds support in cases casting doubt on whether the Sixth Amendment right to counsel extends to a parole release hearing. In *Ganz v. Bensinger,* 480 F.2d 88 (7th Cir.1973), a prisoner claimed that because the Illinois Parole and Pardon Board determined the actual period of incarceration in most cases, the parole release hearing was a "critical stage" of the state's processing of criminal offenders to which the Sixth Amendment right to counsel attached. *Id.* at 89. Writing for the three-judge circuit panel, then Circuit Judge (now Justice) John Paul Stevens rejected the prisoner's claim, holding as follows:

> The Sixth Amendment entitles every person to counsel in a particular kind of proceeding—a criminal trial. That Amendment is inapplicable to other types of proceedings, even though they may have a critical impact on the destiny of the individual. Thus, the Sixth Amendment issue turns not on the importance of the parole release hearing, but rather on whether it is a part of the criminal prosecution.
>
> The prosecution is a judicial proceeding. It does not end until judgment has been entered and sentence imposed. *Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336. Plaintiff argues that if the sentence is of indeterminate length, the sentencing process includes the proceedings before the Parole Board. Logically, that argument would support a conclusion that "the entire range of correctional process after sentencing is a part of the criminal proceeding"—a conclusion we have already rejected. *Gunsolus v. Gagnon,* 454 F.2d 416, 422 (7th Cir.1971), rev'd on other grounds sub nom. *Gagnon v. Scarpelli,* 411 U.S. 582 [778], 93 S.Ct. 1736 [1756], 36 L.Ed.2d 503 [656] (1973). In our opinion, the Sixth Amendment right to representation by counsel at the sentencing hearing applies only to the judicial hearing at which the sentence is fixed. The Amendment protects the accused during the adversary judicial trial; it does not broadly encompass every proceeding which may result in a deprivation of liberty or proper-

ty. As the Supreme Court stated in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484[,] "Parole arises after the end of the criminal prosecution, including imposition of sentence." See *Gagnon v. Scarpelli*, 411 U.S. 778, 781, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). A parole release hearing is not part of the criminal prosecution; the Sixth Amendment is inapplicable.

*Id.* (footnotes omitted).

Utah has an indeterminate sentencing scheme similar to Hawai'i's. The Utah Supreme Court has held that the Sixth Amendment right to counsel does not apply to original parole grant hearings in which the prisoner's presumptive release date is set. *Monson v. Carver*, 928 P.2d 1017, 1029–30 (Utah 1996); *Padilla v. Utah Bd. of Pardons and Parole*, 947 P.2d 664, 670 (Utah 1997).

For the foregoing reasons, I do not join in the majority's Sixth Amendment analysis.